UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMIR HEKMATI<br>1339 Ox Yoke Drive<br>Flint, MI 48532,<br><br>        Plaintiff,<br><br>v.<br><br>THE GOVERNMENT OF THE<br>ISLAMIC REPUBLIC OF IRAN,<br>Its Ministries, Agencies, and Instrumentalities<br>c/o Ministry of Foreign Affairs<br>Khomeni Avenue<br>United Nations Street<br>Tehran, Iran,<br><br>        Defendant. | **JURY DEMAND**<br><br><br><br>**Case No.: 1:16-cv-875** |

## COMPLAINT

Plaintiff Amir Hekmati complains of the actions of the Defendant, The Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities, and states in support thereof as follows:

## PARTIES

1. Plaintiff Amir Hekmati ("Mr. Hekmati") is a U.S. citizen and a resident of Michigan. Mr. Hekmati was falsely imprisoned and tortured for a period of four and a half years by Defendant The Government of the Islamic Republic of Iran, its Ministries, Agencies, and Instrumentalities ("Iran").

2. Iran is a foreign sovereign that has been designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)), both at the time of the matters at issue in this Complaint and at the time this Complaint was filed.

Its activities as complained of herein were outside the scope of immunity provided by the Foreign Sovereign Immunities Act ("FSIA"), including 28 U.S.C. § 1605A.

## JURISDICTION

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330 and 1331, and pursuant to the FSIA, 28 U.S.C. § 1605A.

4. Venue lies in this Court pursuant to 28 U.S.C. § 1391(f)(4).

5. Mr. Hekmati was domiciled in the State of Michigan at the time of his confinement and torture.

## STATEMENT OF FACTS

6. Mr. Hekmati was born in Flagstaff, Arizona in 1983. His parents are naturalized U.S. citizens who emigrated from Iran to the United States in 1979. His father has a Ph.D in Microbiology and was a college professor until his retirement. His mother is an accountant.

7. Mr. Hekmati and his three siblings grew up in Flint, Michigan, where he and his family continue to live today. He graduated with honors from Monterey Peninsula College as an Arabic Linguist and from the University of Phoenix with a degree in global business management.

8. He served in the U.S. Marine Corps from 2001 to 2005 as an infantry rifleman and translator. SGT Hekmati completed two lengthy tours of duty in Iraq in the 2nd Battalion, 4th Marine Regiment, a unit that suffered one of the highest casualty rates in the Marines. He left the Marines a dedicated combat veteran, having received the Good Conduct Medal, Global War on Terror Service Medal, Sea Service Deployment Ribbon, GWOT Expeditionary Medal, National Defense Service Medal, and a Combat Action Ribbon.

9. After Mr. Hekmati completed his service in the Marines, he went on to serve his country as a military contractor, focusing on translation and cultural education.

10. In 2011, Mr. Hekmati applied and was accepted into the University of Michigan's graduate program in economics.

11. On August 14, 2011, just a few weeks before Mr. Hekmati was scheduled to start school, he traveled to Tehran, Iran for the first time to visit his grandmother and other relatives.

12. Mr. Hekmati obtained authorization to travel to Iran from the Iranian Interests Section of the Pakistani Embassy in Washington, D.C. He was open about his U.S. military service during the application process and was assured by officials at the Iranian Interests Section that his military past would not cause any issues for him during his trip. Service in a foreign military for a dual national is not illegal under Iranian law.

13. On August 29, 2011, just two days before he was scheduled to return home to Michigan, Mr. Hekmati was arrested and imprisoned by Iranian officials without warning as he was getting ready to attend a family holiday celebration.

14. When Mr. Hekmati did not arrive at the party, members of his family in Iran went to the cousin's apartment where Mr. Hekmati had been staying. His phone, computer, camera, and passport were missing. It was clear that the apartment had been broken into and that a struggle had taken place. Mr. Hekmati's family in Iran spent months contacting officials, visiting prisons, and searching Tehran for Mr. Hekmati. Iran did not inform Mr. Hekmati's family of where or why it was holding him until two and a half months later.

15. Upon Mr. Hekmati's arrest, he was taken immediately to the notoriously brutal Evin Prison. He was placed in a 1.5-meter by 1-meter solitary confinement cell, where he remained for the next 17 months.

16. During those months, and during the entirety of his four and a half years in captivity, Mr. Hekmati suffered prolonged and continuous physical abuse at the hands of the Iranian Ministry of Intelligence. The torture that Mr. Hekmati endured included being whipped at the bottom of his feet, struck by an electrical Taser to his kidney area, forced to stay in stress positions for hours at a time, and hit with batons. Prison guards threw water on his cell floor to prevent him from sleeping. A very bright light was kept on 24 hours a day to invoke sensory deprivation. Mr. Hekmati's captors would force him to take lithium and other addictive pills and then stop giving him the pills to invoke withdrawal symptoms. He was denied proper medical care and suffered severe malnutrition.

17. Mr. Hekmati also suffered extreme and continuous psychological torture. He had virtually no human contact for 17 months. He was permitted to leave his cell for only 20 minutes every 3 days, and even then, it was only to take a freezing cold shower. He was interrogated regularly. Intelligence officials repeatedly insulted Mr. Hekmati's mother and family and his country. He was taunted for serving honorably as a U.S. Marine. At one point, he was told that his sister had been involved in a terrible car accident, but that he could not use the phone to call his family unless he confessed that he was a spy for the Central Intelligence Agency ("CIA").

18. For months, Mr. Hekmati was not permitted to speak with legal counsel or permitted to call or visit with his family, including his father, who was suffering from terminal brain cancer. He was denied any consular access to the U.S. Interests Section in Iran in violation of the Vienna Convention on Consular Relations. He was held for five months without even being charged.

19. Mr. Hekmati was told that all of these abuses would continue for as long as it took unless and until he confessed to being a spy. After months of trauma, in December 2011, Mr. Hekmati's abusers shifted their tactics. They transported Mr. Hekmati from Evin Prison to Esteghlal Hotel, dressed him in civilian clothes, gave him food and cigarettes, and told him he would be released immediately if he agreed to be interviewed for an internal training video for the Iranian Intelligence Ministry. As part of the interview, Mr. Hekmati's captors demanded that he state that he worked for the CIA. Mr. Hekmati initially refused. His interrogators told him he would be returned to solitary confinement if he did not comply. Mr. Hekmati, having suffered months of physical and psychological abuse, ultimately complied in hopes of being released and reunited with his family, as his abusers had promised. Iran did not release Mr. Hekmati, but rather broadcast the "confession" on Iranian state television as "proof" of Mr. Hekmati's crimes and then returned him to solitary confinement.

20. In January 2012—five months after Mr. Hekmati's arrest and imprisonment—Iran's Revolutionary Court held a 15-minute trial behind closed doors on Mr. Hekmati's "crimes." Mr. Hekmati did not meet his court-appointed defense attorney until five minutes before trial.

21. The court convicted Mr. Hekmati of espionage, waging war against God, and corrupting the earth. He was sentenced to death—the first American to receive a death sentence since the Islamic Revolution in 1979.

22. Mr. Hekmati returned to solitary confinement, continuing to suffer the abuses described above and anticipating his execution.

23. An Iranian appeals court overturned Mr. Hekmati's death sentence in March 2012 based on insufficient evidence. The court re-sentenced Mr. Hekmati to 10 years in prison for

cooperating with a hostile government, presumably due to his U.S. military service.  The trial took place in secret, without the presentation of a defense.  Mr. Hekmati did not learn of the re-trial until April 2014.  In the meantime, he had spent more than three and a half years in prison with no hope of release, enduring the same prolonged physical and psychological torture described above, with a death sentence hanging over him for more than four months.

24.     After nearly an additional year in solitary confinement, Mr. Hekmati was moved to a new prison ward where the prisoners consisted largely of drug dealers and hardened criminals.  His conditions there were even more brutal.  The ward had no heat or warm water.  His cell was infested with rats, which he had to kill himself using a broomstick.  His skin was eaten by lice, fleas, and bed bugs.  He suffered from recurring lung infections and constant stomach problems due to malnutrition.  His health problems were exacerbated even further when he went on a hunger strike.  He continued to suffer regular physical and psychological abuse of the nature described above.

25.     Mr. Hekmati endured this trauma for four and a half years, never knowing if or when he would be released and reunited with his family.

26.     Mr. Hekmati's wrongful detention and torture caused an international uproar.  In August 2013, the United Nation's Working Group on Arbitrary Detention found Mr. Hekmati's deprivation arbitrary and in contravention of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights.  President Obama, Secretary of State John Kerry, and other high-level U.S. officials also called repeatedly for Mr. Hekmati's release.

27.     On January 17, 2016, Mr. Hekmati was released as part of a prisoner trade between Iran and the United States, pursuant to which Iran released Amir and four other imprisoned Americans in exchange for clemency for seven Iranians indicted or imprisoned in the

United States for sanctions violations. The prisoner trade also resulted in the release of certain frozen Iranian assets in the United States.

28. Mr. Hekmati's confinement caused him severe and extreme psychological distress, both during his imprisonment and after his release. Since returning home, Mr. Hekmati has suffered post-traumatic stress disorder and other lasting psychological damage from his captivity and torture.

29. Mr. Hekmati is also jobless and suffering the financial effects of being robbed of four and a half years of income and the master's degree he had intended to obtain before his imprisonment.

## COUNT I

### (PERSONAL INJURIES CAUSED BY TORTURE AND HOSTAGE-TAKING: 28 U.S.C. § 1605A)

30. Paragraphs 1 through 29 above are incorporated as if set forth herein.

31. Mr. Hekmati was a citizen of the United States when arrested and held unlawfully by Iran. While being held, Mr. Hekmati was physically and psychologically tortured as described herein.

32. Anti-terrorism provisions codified at 28 U.S.C. § 1605A(a) establish a federal right of action against Iran for committing acts of hostage-taking and torture.

33. Section 1605A provides four elements for a claim against a foreign state, all of which are met here:

    a. That defendant be designated as a state sponsor of terrorism;

    b. That claimant be a national of the United States;

    c. That the foreign country must be given reasonable opportunity to arbitrate that claim if the conduct took place on foreign soil; and

        d. That the act alleged to be caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act . . . ."

34. Iran was designated a state sponsor of terrorism by the Secretary of State on January 19, 1984. *See* 49 Fed. Reg. 2836 (Jan. 23, 1984).

35. Mr. Hekmati was a citizen of the United States at the time of his imprisonment and torture.

36. The definition of "torture" under the FSIA, derived from § 3 of the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), codified at 28 U.S.C. § 1350 (note), includes:

> Any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person is committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

37. While Mr. Hekmati was in Iran's custody and control, Iran intentionally subjected Mr. Hekmati to four and a half years of severe pain and suffering, including solitary confinement, physical and mental abuse, and threats against his life, all with the intent to obtain a false confession and coerce his cooperation. Iran's conduct constitutes torture as defined under the FSIA.

38. "Hostage-taking" under the FSIA, as derived from Article 1 of the United Nations International Convention Against the Taking of Hostages, No. 21931 (Nov. 1, 1979), is defined as follows:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

39. Iran detained Mr. Hekmati on false espionage charges and threatened to kill, injure, and continue to detain Mr. Hekmati for four and a half years in an attempt to win money or other concessions from the United States. Iran's conduct was hostage-taking as defined under the FSIA.

40. A foreign state is held vicariously liable for the acts of its officials, employees, or agents. 28 U.S.C. § 1605A(c)(4).

41. Mr. Hekmati continues to suffer physical and psychological harm to this day as a result of his hostage-taking and torture by Iran.

## COUNT II

### (§ 1605A(c) CAUSE OF ACTION – ASSAULT AND BATTERY)

42. Paragraphs 1 through 41 above are incorporated as if set forth herein.

43. Iran committed or is responsible for numerous acts of assault and battery upon Mr. Hekmati during his confinement and torture.

44. Under the FSIA, a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

45. Iran is stripped of its immunity under the FSIA because of its acts of hostage-taking and torture, and is therefore liable for torts in the same manner and to the same extent as a private individual.

46. Iran applied force to the person of Mr. Hekmati and took actions reasonably tending to create the apprehension of Mr. Hekmati that it was about to apply such force to him. Iran also intended harmful or offensive contact with Mr. Hekmati without his consent. Iran's conduct included intentionally and repeatedly threatening Mr. Hekmati's life, threatening bodily injury, and physically attacking Mr. Hekmati.

## COUNT III

### (§ 1605A(c) CAUSE OF ACTION – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

47. Paragraphs 1 through 46 above are incorporated as if set forth herein.

48. Iran's use of solitary confinement, threats and physical abuse, and restrictions of Mr. Hekmati's contact with his family was intentional and reckless, extreme and outrageous, and caused Mr. Hekmati severe emotional distress.

49. Iran's treatment of Mr. Hekmati violated acceptable norms of treatment under both U.S. and international law, and was also for that reason extreme and outrageous.

50. Iran's actions left Mr. Hekmati severely emotionally and psychologically damaged.

## COUNT IV

### (§ 1605A(c) CAUSE OF ACTION – FALSE IMPRISONMENT)

51. Paragraphs 1 through 50 above are incorporated as if set forth herein.

52. Mr. Hekmati was deprived of liberty without cause and without legal justification. Iran held Mr. Hekmati despite knowledge that they had no basis to do so.

## **PRAYER FOR RELIEF**

1. As a result of the personal injuries he has suffered due to acts of torture and hostage-taking, Mr. Hekmati is entitled to economic damages and compensatory damages for pain and suffering, all of which are recoverable under the FSIA. 28 U.S.C. § 1605A.

2. In addition to all appropriate compensatory damages, Mr. Hekmati is entitled to punitive damages because Iran's acts were intentional, malicious, and performed deliberately to injure, damage, and harm Mr. Hekmati.

3. Mr. Hekmati further seeks costs, attorneys' fees, and such other relief as may be just and proper, including pre-judgment interest.

Dated: May 9, 2016

Respectfully submitted,

/s/ Emily P. Grim
Scott D. Gilbert (D.C. Bar # 290932)
Mark A. Packman (D.C. Bar # 336321)
Emily P. Grim (D.C. Bar # 1006597)
Gilbert LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
Tel: (202) 772-2200
Fax: (202) 772-3333
gilberts@gotofirm.com
packmanm@gotofirm.com
grime@gotofirm.com

*Attorneys for Plaintiff Amir Hekmati*