# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMIR HEKMATI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 1:16-cv-00875 (ESH)** |
| | ) | |
| THE GOVERNMENT OF THE | ) | |
| ISLAMIC REPUBLIC OF IRAN, | ) | |
| Its Ministries, Agencies, and | ) | |
| Instrumentalities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## IN SUPPORT OF HIS MOTION FOR DEFAULT JUDGMENT

**REDACTED DOCUMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

I.     PROPOSED FINDINGS OF FACT ....................................................................... 2

     A.    Mr. Hekmati's Detention and Torture in Iran ........................................... 2

     B.    Release From Imprisonment ..................................................................... 13

     C.    Life After Imprisonment .......................................................................... 14

          1.    Continued Psychological Harm ................................................... 14

          2.    Loss of Income ............................................................................ 15

II.    THE ISLAMIC REPUBLIC OF IRAN HAS DEFAULTED ............................ 16

III.   STANDARD OF REVIEW FOR ENTRY OF DEFAULT JUDGMENT ....... 17

IV.   MR. HEKMATI HAS ASSERTED COGNIZABLE CLAIMS AGAINST IRAN UNDER THE FSIA. ........................................................................................ 18

     A.    Standard for Proving Jurisdiction and Liability Under the FSIA ........... 18

     B.    Iran Engaged in Torture as Defined by the FSIA. ................................. 20

          1.    Definition of Torture Under the FSIA ....................................... 20

          2.    The Defendants' Abuse of Mr. Hekmati Constitutes Torture ................. 20

          3.    The Defendants Tortured Mr. Hekmati for the Purpose of Eliciting a False Confession and Extracting Concessions From the United States .... 23

     C.    Iran Engaged in Hostage-Taking as Defined By the FSIA. .................... 24

V.    MR. HEKMATI'S INJURIES MEET THE GOVERNING STANDARD OF THE RESTATEMENT OF TORTS. ........................................................................ 25

     A.    Assault and Battery .................................................................................. 25

     B.    False Imprisonment .................................................................................. 26

**\*\*REDACTED DOCUMENT\*\***

C. Intentional Infliction of Emotional Distress ........................................................ 27

VI. DAMAGES .................................................................................................................. 27

    A. Compensatory Damages .......................................................................................... 27

        1. Pain and Suffering During Mr. Hekmati's Imprisonment ........................ 27

        2. Post-Release Pain and Suffering ............................................................... 28

    B. Economic Damages ................................................................................................. 30

    C. Punitive Damages ................................................................................................... 31

CONCLUSION ..................................................................................................................... 33

**REDACTED DOCUMENT**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acree v. Republic of Iraq,*
  271 F. Supp. 2d 179 (D.D.C. 2003)................................................................30

*Anderson v. Islamic Republic of Iran,*
  90 F. Supp. 2d 107 (D.D.C. 2000).................................................................32

*Ben-Rafael v. Islamic Republic of Iran,*
  540 F. Supp. 2d 39 (D.D.C. 2008).................................................................18

*Bettis v. Islamic Republic of Iran,*
  315 F.3d 325 (D.C. Cir. 2003).......................................................................25

*Bluth v. Islamic Republic of Iran,*
  No. CV 12-250, 2016 WL 4491760 (D.D.C. Aug. 25, 2016)..........................25

*Davenport v. DeRobertis,*
  844 F.2d 1310 (7th Cir. 1988).......................................................................22

*Elahi v. Islamic Republic of Iran,*
  124 F. Supp. 2d 97 (D.D.C. 2000).................................................................17

*Finney v. Ark. Bd. of Correction,*
  505 F.2d 194 (8th Cir. 1974).........................................................................22

*Flatow v. Islamic Republic of Iran,*
  999 F. Supp. 1 (D.D.C. 1998)........................................................................32

*Furman v. Georgia,*
  408 U.S. 238 (1972)......................................................................................22

*Gates v. Syrian Arab Republic,*
  580 F. Supp. 2d 53 (D.D.C. 2008).................................................................19

*Hill v. Republic of Iraq,*
  328 F.3d 680 (D.C. Cir. 2003).......................................................................17

*Hutto v. Finney,*
  437 U.S. 678 (1978)......................................................................................22

*Kilburn v. Islamic Republic of Iran,*
  699 F. Supp. 2d 136 (D.D.C. 2010)..........................................................19, 22

*\* Massie v. Government of the Democratic People's Republic of Korea,*
  592 F. Supp. 2d 57 (D.D.C. 2008).......................................................... *passim*

iii

* *Moradi v. Islamic Republic of Iran,*
 77 F. Supp. 3d 57 (D.D.C. 2015) ................................................................... *passim*

*Murphy v. Islamic Republic of Iran,*
 740 F. Supp. 2d 51 (D.D.C. 2010) .................................................................19, 25

*Nikbin v. Islamic Republic of Iran,*
 517 F. Supp. 2d 416 .......................................................................................21

*Opati v. Republic of Sudan,*
 60 F. Supp. 3d 68 (D.D.C. 2014) ..................................................................33

*Osongo v. Republic of Sudan,*
 60 F. Supp. 3d 144 (D.D.C. 2014) .............................................................32, 33

*Oveissi. v. Islamic Republic of Iran,*
 498 F. Supp. 2d 268 (D.D.C. 2007) ..............................................................17

*Oveissi v. Islamic Republic of Iran,*
 879 F. Supp. 2d 44 (D.D.C.2012) ..............................................................25, 31

* *Price v. Socialist People's Libyan Arab Jamahiriya,*
 294 F.3d 82 (D.C. Cir. 2002) ..................................................................20, 21, 24

*Price v. Socialist People's Libyan Arab Jamahiriya,*
 384 F. Supp. 2d 120 (D.D.C. 2005) ..............................................................27

*Reed v. Islamic Republic of Iran,*
 845 F. Supp. 2d 204 (D.D.C. 2012) ..............................................................30

*Silverstein v. Fed. Bureau of Prisons,*
 704 F. Supp. 2d 1077 (D. Colo. 2010) ..........................................................22

*Simpson v. Socialist People's Libyan Arab Jamahiriya,*
 326 F.3d 230 (D.C. Cir. 2003) .................................................................19, 24

*Simpson v. Socialist People's Libyan Arab Jamahiriya,*
 470 F.3d 356 (D.C. Cir. 2006) ....................................................................24

*Stansell v. Republic of Cuba,*
 No. 15-CV-01519 (APM), 2016 WL 6581171 (D.D.C. Nov. 4, 2016) ...........................29, 30

*Stethem v. Islamic Republic of Iran,*
 201 F. Supp. 2d 78 (D.D.C. 2002) ...............................................................27

*Sutherland v. Islamic Republic of Iran,*
 151 F. Supp. 2d 27 (D.D.C. 2001) ............................................................27, 32

**\*\*REDACTED DOCUMENT\*\***

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010) ......................................................26

*Weinstein v. Islamic Republic of Iran*,
    184 F. Supp. 2d 13 (D.D.C. 2002) ......................................................17

*Wilkerson v. Utah*,
    99 U.S. 130 (1878) ..............................................................................22

*Worley v. Islamic Republic of Iran*,
    75 F. Supp. 3d 311 (D.D.C. 2014) ......................................................25

*Wright v. McMann*,
    387 F.2d 519 (2d Cir. 1967) ...............................................................22

## Rules and Statutes

31 C.F.R § 596.201 (2008) .......................................................................19

28 U.S.C. § 1350 ......................................................................................20

28 U.S.C. § 1350 note .........................................................................20, 23

28 U.S.C. § 1605A ............................................................................ *passim*

28 U.S.C. § 1608 ...........................................................................1, 16, 17

Federal Rule of Civil Procedure 55(d) .....................................................17

Torture Victim Protection Act of 1991 .......................................20, 21, 23

## Restatements

Restatement (Second) of Torts ............................................................. *passim*

## Other Authorities

European Union Council Regulation 359/2011, annex I, 2011 O.J. (L 100) 1
    (EU), *available at* http://eur-lex.europa.eu/legal-
    content/EN/TXT/?uri=CELEX:32011R0359 ..........................................7

Indira Lakshmanan, *Fate of Jailed Americans Hangs Over Talks with Iran*,
    Bloomberg News (May 15, 2015), *available at*
    https://www.bloomberg.com/politics/articles/2015-05-15/fate-of-jailed-and-
    missing-americans-hangs-over-iran-talks ...............................................11

J. Herman Burgers & Hans Danelius, The United Nations Convention Against
    Torture 118–19 (1988) .........................................................................20

**\*\*REDACTED DOCUMENT\*\***

Laura Koran, *U.S. to Pay Iran $1.7 Billion in Legal Settlement*, CNN (Jan. 17, 2016), *available at* http://www.cnn.com/2016/01/17/politics/us-pays-iran-1-7-billion/ ...................................................................................................................13, 25

Michael Pearson and Elise Labott, *Five Americans Released by Iran, Four as Part of Prisoner Swap*, CNN (Jan. 16, 2016), *available at* http://www.cnn.com/2016/01/16/middleeast/iran-jason-rezaian-prisoners-freed/ .............................................................................................................................13, 25

Mick Krever, *Iranian Leader: Release our Prisoners, and We'll Consider Doing the Same*, CNN (Sept. 27, 2015), *available at* http://www.cnn.com/2015/09/27/world/rouhani-prisoners-iran-amanpour/index.html .................................................................................................................10

Opinions Adopted by the United Nations Working Group on Arbitrary Detention, No. 28/2013 (Aug. 2013), *available at http://hrlibrary.umn.edu/wgad/28-2013.html* ..................................................................................................................11

Perry Chiaramonte, *Hell on Earth: Inside Iran's Brutal Evin Prison*, Fox News (Jan. 28, 2013), *available at* http://www.foxnews.com/world/2013/01/28/inside-evin-look-at-world-most-notorious-political-prison.html .........................................................................................3

Peter S. Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime and Justice 441 (2006) ...............................22

Rick Gladstone, *Jason Rezaian Trial In Iran May Be More About Leverage Than Justice*, N.Y. Times (May 27, 2015), *available at* http://www.nytimes.com/2015/05/28/world/middleeast/jason-rezaian-trial-in-iran-may-be-more-about-leverage-than-justice.html ...............................................11

Saeed Kamali Dehgan, *Six Judges Accused of Leading Role in Iranian Crackdown on Free Speech*, The Guardian (July 31, 2014), *available at* https://www.theguardian.com/world/2014/jul/31/six-judges-iran-crackdown-journalists-activists .......................................................................................................7

State Sponsors of Terrorism, U.S. Dept. of State, http://www.state.gov/j/ct/list/c14151.htm (2016) ....................................................19

Steve Inskeep & Bill Chappell, *Speaker of Iran's Parliament Suggests Prisoner Swap for Rezaian, Other Americans*, NPR (Sept. 3, 2015), *available at* http://www.npr.org/sections/thetwo-way/2015/09/03/437322607/speaker-of-iran-s-parliament-suggests-prisoner-swap-for-rezaian-other-americans ..................................11

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y 325 (2006) ..............................................................................................................22

vi

**REDACTED DOCUMENT**

Thomas Erdbrink, *Amid Report of Jason Rezaian's Conviction, Iran Hints at Prisoner Exchange*, N.Y. Times (Oct. 12, 2015), *available at* http://www.nytimes.com/2015/10/13/world/middleeast/jason-rezaian-washington-post-conviction-iran.html ..................................................................................11

U.S. Dept. of State, *Country Reports on Human Rights Practices for 2012: Iran* at 7, U.S. Dept. of State Website (2012), *available at* http://www.state.gov/j/drl/rls/hrrpt/2012humanrightsreport/index.htm?year=2012&dlid=204359#wrapper ..........................................................................................3

U.S. Dept. of Treasury, *Treasury Designates Iran Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism*, U.S. Dept. of Treasury Press Center (Feb. 16, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx ...............................3

**\*\*REDACTED DOCUMENT\*\***

**INTRODUCTION**

For 1,602 days, from August 29, 2011, to January 16, 2016, the Islamic Republic of Iran and its ministries, agencies, and instrumentalities (collectively, the "Defendants," "Iranian Government," or "Iran") wrongfully incarcerated and tortured Plaintiff Amir Hekmati (the "Plaintiff" or "Mr. Hekmati"), a citizen of the United States.  For more than four years, Iran subjected Mr. Hekmati to relentless physical and psychological abuse, including 18 months of solitary confinement, solely in an attempt to win financial and political concessions from the United States.  As a result, Mr. Hekmati's career and family were severely damaged, and he suffered and will continue to suffer severe psychological trauma and substantial economic losses for the rest of his life.

For the reasons set forth below, Mr. Hekmati is entitled to default judgment under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608, for the ongoing injuries he has suffered as a result of the Defendants' acts of torture and hostage-taking.  Section I sets forth Mr. Hekmati's proposed findings of fact regarding his fabricated arrest, imprisonment, and torture in Iran and the resultant harm he has suffered.  Section II demonstrates that Iran has defaulted by failing to respond to this suit.  Section III outlines the standards under which this Court may grant default judgment to Mr. Hekmati.  Section IV establishes that Iran's egregious acts constitute torture and hostage-taking under the FSIA, thus bringing Iran within the jurisdiction of U.S. courts.  Section V demonstrates that Iran is liable for assault, battery, false imprisonment, and intentional infliction of emotional distress as a result of its terrorist acts.  Section VI establishes Mr. Hekmati's right to receive compensatory and punitive damages for his severe psychological and economic injuries.

**\*\*REDACTED DOCUMENT\*\***

## I.      PROPOSED FINDINGS OF FACT

### A.      Mr. Hekmati's Detention and Torture in Iran

On August 14, 2011, 28-year-old Amir Hekmati, a dual U.S.–Iranian citizen from Flint,

Michigan, traveled to Tehran, Iran to visit relatives and to explore the country of his parents'

birth.  Declaration of Amir Hekmati ¶¶ 24–26 ("A. Hekmati Decl.") (attached as Ex. A).

Mr. Hekmati, a decorated combat veteran who had served two tours of duty in Iraq with the

U.S. Marines, took the opportunity to travel to Iran just weeks before he was to begin a graduate

program in economics at the University of Michigan.  *Id.*  At the time of his trip to Iran,

Mr. Hekmati was building a bright career as a defense analyst and making plans with his long-

time girlfriend for marriage and family.  *Id.* ¶ 23.

On August 29, 2011, two days before he was scheduled to return home to Michigan,

Mr. Hekmati was preparing to attend a family holiday celebration when officials from the Iranian

Ministry of Intelligence and Security ("MOIS") came to the apartment where he was staying and

shuttled him to a nearby office building to "answer a few questions about his passport."  *Id.* ¶ 30.

Upon arriving at the office building, MOIS officials accused Mr. Hekmati of working for the

CIA, interrogated him about his activities in Iran, and threatened to take him to "a very bad

place" if he did not confess.  *Id.* ¶¶ 31–33.

When Mr. Hekmati insisted that he had come to Iran only to visit family, he was

handcuffed and taken to Evin Prison—Iran's most notoriously brutal prison.  *Id.* ¶¶ 33–34.  Upon

his arrival, he was strip-searched, given blue prison pajamas, blindfolded, and taken to a small,

windowless cell.  *Id.*  Mr. Hekmati did not know at the time that he was to spend the next four-

and-a-half years in Evin Prison.  *Id.* ¶ 35.

For the first 18 months of his imprisonment, Mr. Hekmati was held in solitary

confinement in Ward 209, which is used by MOIS to torture prisoners into confessing to alleged

**\*\*REDACTED DOCUMENT\*\***

"crimes."[1]  *Id.* ¶ 36.  His cell was so small that he could not stretch his legs when he laid down. *Id.* ¶ 37.  The concrete walls of the cell were curved, which threw off his depth perception and made him feel constantly like the walls were caving in on him.  *Id.*  The floor consisted of cold tile covered with a thin carpet.  *Id.*  Mr. Hekmati had no mattress; only a thin blanket that did nothing to insulate him from the cold tile.  *Id.*  Prison officials continually prevented Mr. Hekmati from sleeping by pouring water on the floor of his cell so that it remained cold and damp, quickly growing moldy.  *Id.*  There was nothing else in the cell except a Koran and a small makeshift "toilet," which was akin to a pail with a hose.  *Id.* ¶ 38.  There was no plumbing and no toilet paper.  *Id.*  The air was so heavy and polluted that Mr. Hekmati had trouble breathing. *Id.*  Even the guards wore surgical masks.  *Id.*

Because Mr. Hekmati had no window, he had no concept of whether it was daytime or nighttime.  *Id.* ¶ 39.  Prison officials kept bright lights on in his cell 24 hours a day.  *Id.*  At times, the power went out, and Mr. Hekmati was left in complete darkness for hours at a time, unable to see even his own hands in front of his face.  *Id.*  He described the blackouts as making him feel like he was "buried alive."  *Id.*

---

[1] *See* U.S. Dept. of Treasury, *Treasury Designates Iran Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism*, U.S. Dept. of Treasury Press Center (Feb. 16, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx; U.S. Dept. of State, *Country Reports on Human Rights Practices for 2012: Iran* at 7, U.S. Dept. of State Website (2012), *available at* http://www.state.gov/j/drl/rls/hrrpt/2012humanrightsreport/index.htm?year=2012&dlid=204359#wrapper (noting that Ward 209 is outside the control of prison authorities and controlled by MOIS); *see also* Perry Chiaramonte, *Hell on Earth: Inside Iran's Brutal Evin Prison*, Fox News (Jan. 28, 2013), *available at* http://www.foxnews.com/world/2013/01/28/inside-evin-look-at-world-most-notorious-political-prison.html.

Mr. Hekmati was permitted to leave his cell only once every few days for 10–15 minutes to take a cold shower.  *Id.* ¶ 40.  Otherwise, he was taken from his cell only for interrogations, which also occurred every few days.  *Id.*  He was always blindfolded before leaving his cell.  *Id.*

Mr. Hekmati was tortured continuously over the first four months of his imprisonment. *Id.* ¶ 41.  Prison guards regularly beat him with batons and struck him in his kidneys with electric tasers to intimidate and punish him for his alleged "crimes."  *Id.*  His interrogator chained him to a table blindfolded and whipped the bottom of his feet with cables as punishment for not giving him the answers he wanted.  *Id.* ¶ 42.  Mr. Hekmati described the whipping as "excruciating." *Id.*  Because Mr. Hekmati could not move, he felt the pain not just on his feet, but reverberating through his head, "like a screwdriver jammed into my brain."  *Id.*  Apart from the physical pain, the whipping was intended to humiliate Mr. Hekmati.  *Id.*  Because the wounds were on his feet, they were slow to heal; his feet became swollen, and he could not walk properly.  *Id.*

On multiple occasions, Mr. Hekmati was handcuffed in stress positions for hours at a time.  *Id.* ¶ 43.  During one such episode, he was handcuffed with one arm reaching behind his shoulder and the other hand behind his back for nearly 48 hours.  *Id.*  The position prevented Mr. Hekmati from sitting the entire time and caused excruciating pain in his shoulder.  *Id.*

Mr. Hekmati also suffered constant psychological abuse.  *Id.* ¶ 44.  Prison guards mercilessly taunted and belittled him, insulting Mr. Hekmati, his mother, and his country.  *Id.* Prison officials lied that Mr. Hekmati's sister had been involved in a terrible car accident, then refused him access to a phone to call his family unless he confessed that he was a spy.  *Id.*

Mr. Hekmati had no contact with the outside world during the first 18 months of his imprisonment.  *Id.* ¶ 45.  He was not permitted to speak to his family or to a lawyer.  *Id.* He worried constantly about his family—in particular his mother, with whom he was very close.

**REDACTED DOCUMENT**

*Id.*  He did not know if his family knew where he was or if he was alive.  *Id.*  Indeed, Mr. Hekmati had almost no physical contact with anyone, apart from the taunts and beatings by the guards and his interrogator.  *Id.*  He could tell there were other prisoners in the ward, but he could not communicate with them; he only knew they were there because he could hear them screaming when they were tortured or taken from their cells for execution.  *Id.*

Mr. Hekmati lost 20 pounds during his first few months at Evin.  *Id.* ¶ 49.  He was served very little food—a slice of bread and margarine in the morning, soggy rice and lentils for lunch, and a small cup of soup or lentils in the evening.  *Id.*

Mr. Hekmati's physical and psychological health deteriorated rapidly, to the point where he thought he was losing his mind.  *Id.* ¶ 51.  He lost track of time and stared at the wall all day.  *Id.*  He began talking to the walls, as if they were a family member or friend from home.  *Id.* ¶ 47.  Often, Mr. Hekmati would feel that the walls were caving in on him and that he could not breathe.  *Id.* ¶ 51.  He had numerous panic attacks, during which he would start banging and clawing at the door, screaming for the guards.  *Id.*  He was met only with taunts and more beatings.  *Id.*  He thought about suicide often.  *Id.*

Roughly three months into Mr. Hekmati's solitary confinement, the guards started forcing him to take sedatives.  *Id.* ¶ 52.  The sedatives made it even harder for him to keep track of time.  *Id.*  Mr. Hekmati drifted in and out of consciousness.  *Id.*  He described himself as "a living corpse."  *Id.*

Although Mr. Hekmati resisted the pills initially, they quickly became his lifeline, as they allowed him to feel numb.  *Id.* ¶ 53.  Once he was hooked on the pills, however, his interrogator used them as a means of controlling him.  *Id.* ¶ 54.  The interrogator would cut off the pills abruptly to attempt to coerce Mr. Hekmati to do things or say things that were untrue.  *Id.*

**\*\*REDACTED DOCUMENT\*\***

Mr. Hekmati felt out of control when he was not given his pills. *Id.* He stopped sleeping and started experiencing panic attacks again. *Id.* He felt he would do anything to get more pills. *Id.*

Mr. Hekmati's interrogator told him that all of these abuses would continue for as long as it took for him to confess to being a spy sent to Iran by the CIA to collect intelligence and spread pro-U.S. propaganda. *Id.* ¶ 55. The interrogator and guards made numerous comments to Mr. Hekmati indicating that he was being used as a pawn by the Iranian Government to spread anti-U.S. propaganda and to win concessions from the U.S. Government. *Id.* For example, they told him on numerous occasions that "his Government"—meaning the United States—needed to "cooperate" if he was to be released. *Id.*

After four months of trauma and solitary confinement, in December 2011, Mr. Hekmati's abusers shifted their tactics. *Id.* ¶ 56. They transported him from Evin Prison to a local hotel, dressed him in civilian clothes, gave him food, cigarettes, and more pills, and told him he would be released immediately if he agreed to be interviewed for an internal training video for MOIS. *Id.* As part of the interview, Mr. Hekmati's captors demanded that he state that he had been sent to Iran by the CIA. *Id.* Initially, he refused, but his interrogators told him he would go back to solitary confinement if he did not comply. *Id.* At that point, Mr. Hekmati had suffered months of physical and psychological abuse, without even being charged for a crime or given a chance to talk to a lawyer or diplomatic official. *Id.* ¶ 57. Mr. Hekmati had not spoken to his family since his arrest. *Id.* He was suffering from chemical withdrawal and desperate to go home. *Id.* He decided to comply in hopes of being released, as his interrogators had assured him he would be. *Id.*

**REDACTED DOCUMENT**

After making the video, Mr. Hekmati was returned promptly to solitary confinement.  *Id.* ¶ 59.  Unbeknownst to Mr. Hekmati at the time, the Defendants broadcast his false "confession" on Iranian state television as "proof" of his crimes.  *Id.*

In January 2012—five months after Mr. Hekmati's arrest—Iran's Revolutionary Court held a 15-minute trial behind closed doors on his "crimes."  *Id.* ¶ 61.  Mr. Hekmati knew nothing of the charges against him or even that a trial was about to occur.  *Id.*  He did not meet his court-appointed defense attorney until five minutes before trial.  *Id.*  The court convicted Mr. Hekmati of espionage, waging war against God, and corrupting the earth.  *Id.* ¶ 62.  He was sentenced to death, to be executed immediately by hanging.  *Id.*  Prison guards informed Mr. Hekmati of his sentence by showing him the front page of an Iranian state newspaper, which announced his imminent execution with triumph.  *Id.* ¶ 63.  The beatings and taunts continued.  *Id.* ¶ 64.

Mr. Hekmati's wrongful conviction and death sentence without proper legal process were consistent with a long history of Iran using the judicial system for political ends.  The Revolutionary Court, which hears cases involving alleged crimes against national security and acts against Islam, is known to "work hand in hand with [Iran's] intelligence service officers and to a great extent follow the instructions from them."[2]  The judge presiding over Mr. Hekmati's case, Judge Abolghassem Salavati, was sanctioned by the European Union in 2011 for human rights violations, including presiding over "show trials" and sentencing more than one hundred demonstrators, political prisoners, and human rights activists to lengthy prison sentences.[3]

---

[2] *See* Saeed Kamali Dehgan, *Six Judges Accused of Leading Role in Iranian Crackdown on Free Speech*, The Guardian (July 31, 2014), *available at* https://www.theguardian.com/world/2014/jul/31/six-judges-iran-crackdown-journalists-activists.

[3] European Union Council Regulation 359/2011, annex I, 2011 O.J. (L 100) 1, 6 (EU), *available at* http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:32011R0359.

**REDACTED DOCUMENT**

Mr. Hekmati's death sentence haunted him daily. *Id.* ¶ 65. He regularly could hear other prisoners being dragged from their cells to be executed. *Id.* Every day, he awoke wondering if it was his execution day. *Id.* He described himself as being "in a constant state of fear and anxiety." *Id.* He started having nightmares and more frequent panic attacks. *Id.* Mr. Hekmati's remaining mental strength began to crumble. *Id.* ¶ 66. He stopped eating and sleeping. *Id.* He paced his cell anxiously at all hours, terrified that his executioners were about to arrive. *Id.* He had constant visions of his execution.[4] *Id.*

Several months later, Mr. Hekmati was abruptly taken back to court for a new trial in front of a different judge. *Id.* ¶ 67. He learned that an Iranian appeals court had overturned his death sentence months before based on insufficient evidence. *Id.* Like the previous trial, this second trial was held behind closed doors and lasted no more than 10 minutes. *Id.*

The new court convicted Mr. Hekmati of cooperating with a hostile government, presumably due to his U.S. military service. *Id.* ¶ 68. He was sentenced to 10 years in Evin— the maximum sentence for such a crime. *Id.* Mr. Hekmati did not learn of his conviction and the lifting of his death sentence until months later, again through newspapers the guards showed him. *Id.*

At that time, Mr. Hekmati still had no contact with his family. *Id.* ¶ 69. Mr. Hekmati learned later that his court-appointed lawyer had told his mother that if she wired $20,000 to him in secret, he could guarantee that Mr. Hekmati only would be sentenced to one year in prison.



**REDACTED DOCUMENT**

*Id.*  She sent the money, and still Mr. Hekmati got the maximum sentence.  *Id.*; Declaration of Behnaz Hekmati ¶ 6 ("B. Hekmati Decl.") (attached as Ex. C).

By this time, Mr. Hekmati had spent nearly a year in solitary confinement.  A. Hekmati Decl. ¶ 70.  He felt some relief when his death sentence was annulled, but he knew the courts could re-instate the sentence at any time if it suited Iran's political needs.  *Id.*  His fear of execution festered, never going away.  *Id.*  He continued to live for his daily dose of pills.  *Id.*

Mr. Hekmati could not bear the thought of spending 10 more years in solitary confinement.  *Id.* ¶ 71.  He went on multiple hunger strikes to protest his conditions.  *Id.* Eighteen months into his imprisonment, he became unconscious after a prolonged hunger strike. *Id.* ¶ 72.  He suffered a head injury when he fell.  *Id.*  Fearing that Mr. Hekmati's death in prison would be bad publicity for the regime, Iranian officials transferred him out of solitary confinement and to a political prison in Ward 350, where he remained for approximately one year-and-a-half.  *Id.*

Mr. Hekmati was relieved to be out of solitary confinement, but Ward 350 brought with it a new set of horrors.  Conditions were terrible; 20–30 prisoners were packed together in a small cell.  *Id.* ¶ 74.  Everyone had physical and psychological problems.  *Id.*  The food was the same as in Ward 209.  *Id.*  There were no beds; only pieces of wood suspended from the wall.  *Id.* Prison officials stopped giving Mr. Hekmati his pills, which caused him months of painful physical withdrawal.  *Id.*  Prisoners regularly were dragged out of the cell for execution or beatings.  *Id.*  The guards indicated that prisoners would be helped if they snitched on other prisoners, so there was a constant atmosphere of fear and distrust among the population.  *Id.*

9

**\*\*REDACTED DOCUMENT\*\***

Ward 350 had a small courtyard where prisoners could see a small patch of sky. *Id.* ¶ 75. However, the courtyard was so small that Mr. Hekmati could do little more than move in tight circles. *Id.*

Mr. Hekmati still was not allowed to use the phone or speak to a lawyer, diplomatic officials, or his family back home. *Id.* ¶ 76. He was permitted to meet with his uncle once a month for 20–30 minutes, but the news of his family was devastating. *Id.* Shortly after learning Mr. Hekmati had been sentenced to death, his father had suffered a major stroke, followed by a diagnosis of advanced brain cancer. *Id.* ¶ 77. He had lost his mobility and could no longer care for himself. *Id.* In the meantime, Mr. Hekmati's older sister had quit her job to lobby for his release full-time, despite having two young children at home. *Id.* His family was spending tens-of-thousands of dollars on lawyer fees and expenses to lobby for his release. *Id.*

News of his family's suffering intensified Mr. Hekmati's own suffering. *Id.* ¶ 78. He thought every day of his mother, who had been left to deal with a son on death row in Iran and a husband in the hospital, but he was powerless to help. *Id.*

It was clear to Mr. Hekmati and his family that he was just a pawn in the Iranian Government's efforts to extract concessions from the United States. For example, the judge presiding over Mr. Hekmati's case told his family to do more to pressure the U.S. Government to cooperate with the Iranian Government's demands. B. Hekmati Decl. ¶¶ 4–5. When asked by the press about releasing Mr. Hekmati and other U.S. prisoners, Iranian President Hassan Rouhani and Ali Larijani, speaker of Iran's parliament, repeatedly responded that the U.S. must first address the fact that a number of Iranians were held in U.S. prisons.[5]

---

[5] Mick Krever, *Iranian Leader: Release our Prisoners, and We'll Consider Doing the Same*, CNN (Sept. 27, 2015), *available at* http://www.cnn.com/2015/09/27/world/rouhani-prisoners-

10

Indeed, Mr. Hekmati's arrest and imprisonment was widely understood to be part of an effort by the Iranian Government to exert pressure on negotiations with the U.S. over Iran's uranium enrichment program.[6]  Such behavior was consistent with Iran's long track record of strategic arrests of dual U.S.–Iranian citizens for political leverage, which has been the subject of numerous government and human rights reports.  *See* Sec. IV.B.3, *infra*.

About one year-and-a-half after Mr. Hekmati arrived in Ward 350, a major riot occurred. A. Hekmati Decl. ¶ 80.  As punishment, Mr. Hekmati and the other prisoners of Ward 350 were transferred to the general population prison.  Mr. Hekmati was transferred to Ward 7, where he was housed with drug dealers and other violent criminals.  *Id.*

Mr. Hekmati's conditions in Ward 7 were some of the most brutal he had faced in his three years at Evin.  *Id.* ¶ 81.  His "cell" was a basement typically used to quarantine sick prisoners.  *Id.*  As in Ward 350, his cell contained 20–30 prisoners packed into a small space.  *Id.* The cell was infested with rats, which Mr. Hekmati and other prisoners had to kill using

---

iran-amanpour/index.html; Thomas Erdbrink, *Amid Report of Jason Rezaian's Conviction, Iran Hints at Prisoner Exchange*, N.Y. Times (Oct. 12, 2015), *available at* http://www.nytimes.com/2015/10/13/world/middleeast/jason-rezaian-washington-post-conviction-iran.html; Steve Inskeep & Bill Chappell, *Speaker of Iran's Parliament Suggests Prisoner Swap for Rezaian, Other Americans*, NPR (Sept. 3, 2015), *available at* http://www.npr.org/sections/thetwo-way/2015/09/03/437322607/speaker-of-iran-s-parliament-suggests-prisoner-swap-for-rezaian-other-americans.

[6] *See, e.g.*, Rick Gladstone, *Jason Rezaian Trial In Iran May Be More About Leverage Than Justice*, N.Y. Times (May 27, 2015) (quoting a former diplomat involved in negotiations to free Americans in Iran as saying "it was possible [Iran] did not want to resolve the prisoner issue because it was part of a negotiating strategy"), *available at* http://www.nytimes.com/2015/05/28/world/middleeast/jason-rezaian-trial-in-iran-may-be-more-about-leverage-than-justice.html; Indira Lakshmanan, *Fate of Jailed Americans Hangs Over Talks with Iran*, Bloomberg News (May 15, 2015), *available at* https://www.bloomberg.com/politics/articles/2015-05-15/fate-of-jailed-and-missing-americans-hangs-over-iran-talks; *see also* Opinions Adopted by the United Nations Working Group on Arbitrary Detention, No. 28/2013 (Aug. 2013), *available at* http://hrlibrary.umn.edu/wgad/28-2013.html (finding Mr. Hekmati's detention arbitrary and in contravention of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights).

**REDACTED DOCUMENT**

broomsticks or other blunt objects. *Id.* There were no beds. *Id.* His skin was eaten by lice and fleas. *Id.* He would wake up with bed bugs all over him. *Id.* Prison officials would occasionally spray the room with chemicals to get rid of the bed bugs, which made the prisoners sicker than the bug bites did. *Id.*

The ward had no heat, air conditioning, or ventilation. *Id.* ¶ 82. There was no courtyard or outdoor recreational space. *Id.* The air was heavy, hot, and thick with germs. *Id.* There were no toilets; rather, there were three holes in the ground with a hose next to them. *Id.* The showers were directly next to the toilet holes. *Id.* Because of the terrible ventilation, the showers became a breeding ground for infection. *Id.* Prisoners wore surgical masks in the shower, but, because they each only got one mask, those masks quickly became filthy. *Id.*

Mr. Hekmati was sick the entire year-and-a-half he spent in Ward 7. *Id.* ¶ 83. He suffered from recurring lung and sinus infections and constant intestinal problems due to malnutrition and the poor sanitary conditions of the prison. *Id.* Prison officials would ignore prisoners' ailments unless they had a high fever, which they would "treat" by injecting them with steroids that actually suppressed the immune system, making the infection worse. *Id.* Eventually, Mr. Hekmati stopped requesting treatment altogether. *Id.*

Mr. Hekmati lived in constant fear of the other prisoners in Ward 7. *Id.* ¶ 84. Prison officials put violent criminals in Mr. Hekmati's cell to pressure prisoners like him to confess or swear allegiance to the Iranian Government. *Id.* The guards and the violent criminals beat other prisoners often as a threat to the rest of the population. *Id.* One prisoner's face was torn apart by a razor blade. *Id.* Many of the political prisoners who had been transferred with Mr. Hekmati suffered mental breakdowns from the trauma of the surroundings. *Id.* Mr. Hekmati tried not to make trouble; his only goal was to stay alive. *Id.*

**\*\*REDACTED DOCUMENT\*\***

Mr. Hekmati finally was permitted to call his family, but his phone access was limited to 5–10 minutes per day.  *Id.* ¶ 85.  The news he learned from his family was disheartening.  His father's health was deteriorating rapidly.  *Id.* ¶ 86.  His family's efforts to obtain his release seemed to be going nowhere.  *Id.*  When Iranian Government officials were asked about Mr. Hekmati's detention by reporters or the U.S. Government, they continued to respond that there were also Iranians unjustly imprisoned in the United States.  *Id.*; B. Hekmati Decl. ¶ 5; *see also* n.5, *supra*.  It was clear to Mr. Hekmati and his family that Iranian officials were biding their time until his imprisonment yielded something valuable for them.  A. Hekmati Decl. ¶ 86; B. Hekmati Decl. ¶¶ 4–5.  He felt that he would never make it out of Evin.  A. Hekmati Decl. ¶ 86.

### B.    Release From Imprisonment

In January 2016, approximately four-and-a-half years into Mr. Hekmati's imprisonment, Iran released Mr. Hekmati and four other imprisoned Americans in exchange for clemency for seven Iranians indicted or imprisoned in the United States for sanctions violations.[7]  The prisoners were released the day the nuclear agreement went into effect, pursuant to which the U.S. lifted sanctions on Iran and released billions of dollars in frozen Iranian assets.[8]  The U.S. also released an additional $1.7 billion in frozen Iranian assets to resolve a longstanding property dispute between the U.S. and Iran.[9]

---

[7] Michael Pearson and Elise Labott, *Five Americans Released by Iran, Four as Part of Prisoner Swap*, CNN (Jan. 16, 2016), *available at* http://www.cnn.com/2016/01/16/middleeast/iran-jason-rezaian-prisoners-freed/.

[8] *Id.*

[9] Laura Koran, *U.S. to Pay Iran $1.7 Billion in Legal Settlement*, CNN (Jan. 17, 2016), *available at* http://www.cnn.com/2016/01/17/politics/us-pays-iran-1-7-billion/.

**REDACTED DOCUMENT**



14

**REDACTED DOCUMENT**

[REDACTED]

### 2.    Loss of Income

Before his imprisonment, Mr. Hekmati had been gainfully employed since graduating from high school a decade earlier.  A. Hekmati Decl. ¶¶ 14–23.  He had started a consulting company, Lucid Linguistics, which provided language and cultural instruction and technology to the U.S. military.  *Id.* ¶ 15.  He had patented an instructional methodology for languages that was purchased by Vcom3D for $300,000, *id.* ¶ 16, and he made a steady salary working as a defense contractor and language specialist.  *Id.* ¶¶ 14–23.  At the time of his detention, he was about to begin a graduate degree in economics at the University of Michigan, which would have increased his earning potential.  *Id.* ¶ 23; Earning Capacity Evaluation of Robert Taylor at 13 ("Taylor Rep.") (attached as Ex. E).

**REDACTED DOCUMENT**

Because of his detention, Mr. Hekmati was prevented from attending graduate school or working for four-and-a-half years.  A. Hekmati Decl. ¶ 107.  He has yet to regain employment since his release.  *Id.* ¶¶ 108–09. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████

## II.      THE ISLAMIC REPUBLIC OF IRAN HAS DEFAULTED.

Mr. Hekmati initiated this action on May 9, 2016.  Mr. Hekmati's suit, which seeks damages for the ongoing injuries he has suffered as a result of Iran's acts of torture and hostage-taking, is well within the ten-year statute of limitations for terrorism claims under the FSIA.  *See* 28 U.S.C. § 1605A(b).

As required by 28 U.S.C. § 1608(a)(4), Mr. Hekmati served Iran by submitting two copies of the summons, complaint, and notice of the suit, along with translations of each into

16

Farsi, to the Clerk of Court on May 26, 2016.[10]  (ECF No. 5.)  The Clerk forwarded the

documents to the U.S. Department of State, ECF No. 6, which confirmed that the documents

were served on Iran on October 18, 2016.  (ECF No. 7.)  The Iranian Ministry of Foreign Affairs

refused service that same day.  *Id.*

On December 20, 2016, shortly after the Defendants' 60-day window to respond to the

Complaint had expired, the Plaintiff requested entry of default against the Defendants.  (ECF

No. 8.)  The Clerk of Court entered default against Iran on December 21, 2016.  (ECF No. 10.)

The Plaintiff now seeks entry of judgment on Iran's default.

### III.    STANDARD OF REVIEW FOR ENTRY OF DEFAULT JUDGMENT

The FSIA requires that plaintiffs establish their "claim or right to relief by evidence

satisfactory to the court."  28 U.S.C. § 1608(e).  The standard for evaluating claims under § 1608

is identical to the standard for entry of default judgment against the United States in Federal Rule

of Civil Procedure 55(d).  *Hill v. Republic of Iraq*, 328 F.3d 680, 683–84 (D.C. Cir. 2003).  A

plaintiff must prove that the projected consequences of a defendant's offenses are "reasonably

certain" (i.e., more likely than not) to occur, and must prove the amount of damages by a

"reasonable estimate."  *Id.* at 681.

In evaluating plaintiffs' proof, courts should "accept as true the plaintiffs' uncontroverted

evidence."  *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000).  A plaintiff

can establish such proof by affidavit.  *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13,

19 (D.D.C. 2002); *Oveissi. v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 272 (D.D.C. 2007).

---

[10] *See* U.S. District Court for the District of Columbia's Attorney Manual for Service of Process on a Foreign Defendant, 7 (Amended March 2016) (stating that when serving Iran, it is appropriate for attorneys to request service directly through diplomatic channels, without first attempting service under provisions a(1)–(3) of § 1608).

**REDACTED DOCUMENT**

The court need not hold an evidentiary hearing before entering default judgment against a foreign state and may "take judicial notice of related proceedings and records in cases before the same court." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 65 (D.D.C. 2015).

Consistent with the foregoing standards, Mr. Hekmati submits these proposed findings of fact and conclusions of law, along with declarations and other evidence supporting his request for judgment against Iran under the FSIA.  This evidence, to which the Defendants have by their default not objected or countered, establishes Mr. Hekmati's right to the relief sought. Mr. Hekmati and his witnesses are available at the Court's convenience should the Court require further testimony or a hearing.

## IV.    MR. HEKMATI HAS ASSERTED COGNIZABLE CLAIMS AGAINST IRAN UNDER THE FSIA.

### A.    Standard for Proving Jurisdiction and Liability Under the FSIA

The FSIA provides both a jurisdictional basis and a private cause of action for claimants to bring suit against a foreign government or its agents for injuries caused by acts of "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).

The FSIA imposes four requirements to establish jurisdiction over a foreign government or its agents for such acts of terrorism:  (1) the claimant or victim must be a national of the United States; (2) the terrorist act must be alleged to have caused personal injury or death; (3) the foreign state must be designated a state sponsor of terrorism at the time of the act; and (4) if the act occurred in the foreign state, the state must be provided a reasonable opportunity to arbitrate the claim.  *Id.* § 1605A(a)(2).

18

**REDACTED DOCUMENT**

Liability under § 1605A exists whenever the jurisdictional requirements of 1605A(a)(1) are met.  *Moradi*, 77 F. Supp. 3d at 69 (citing *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010)); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 64–69 (D.D.C. 2008); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 72 (D.D.C. 2010).  Accordingly, if the Court determines that Iran, acting through its agents, committed terrorist acts within the meaning of 1605A(a)(1), it follows that Iran is liable under 1605A(c) for any personal injuries caused by those acts.

Here, Mr. Hekmati has satisfied all requirements of 1605(A)(a)(1)-(2), meaning that Mr. Hekmati has established both jurisdiction over Iran and Iran's liability.  First, Mr. Hekmati was a citizen of the United States at the time Iran wrongfully arrested and tortured him. A. Hekmati Decl. ¶ 3.  Second, as discussed in greater detail below, the Iranian Government engaged in torture and hostage-taking as defined by the FSIA and caused Mr. Hekmati grave physical and mental harm.  *See infra* Sec. IV.B–C.  Third, the U.S. Department of State designated Iran a state sponsor of terrorism on January 19, 1984, and has maintained that designation to the present.  31 C.F.R § 596.201 (2008); State Sponsors of Terrorism, U.S. Dept. of State, http://www.state.gov/j/ct/list/c14151.htm (2016).  Fourth, Mr. Hekmati included an offer of arbitration with the documents served on Iran on October 18, 2016.  *See* ECF No. 7; *see also Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003) ("*Simpson I*") (finding that the FSIA merely requires that the foreign government be allowed "a reasonable opportunity" to arbitrate, which need not be provided before filing the complaint).

19

**REDACTED DOCUMENT**

**B.**     **Iran Engaged in Torture as Defined by the FSIA.**

**1.**     **Definition of Torture Under the FSIA**

The FSIA permits U.S. citizens to bring suit against a foreign country or its agents for

acts of torture.  "Torture" under the FSIA, as derived from Torture Victim Protection Act of

1991 ("TVPA"), is defined as follows:

> any act, directed against an individual in the offender's custody or physical
> control, by which severe pain or suffering (other than pain or suffering arising
> only from or inherent in, or incidental to, lawful sanctions), whether physical or
> mental, is intentionally inflicted on that individual for such purposes as obtaining
> from that individual or a third person information or a confession, punishing that
> individual for an act that individual or a third person has committed or is
> suspected of having committed, intimidating or coercing that individual or a third
> person, or for any reason based on discrimination of any kind.

*See* TVPA § 3(b); 28 U.S.C. § 1350 note; *id.* § 1605A(h)(7).

The TVPA further defines torture as any prolonged mental harm resulting from:  (1) the

infliction or threatened infliction of severe physical or mental pain; (2) the use of mind-altering

drugs or other procedures intended to disrupt the senses; (3) the threat of imminent death; or

(4) the infliction or threatened infliction of one of these actions on a third person.  *Id.*

Courts agree that the severity of the abuse determines whether the conduct amounts to

torture.  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002)

("*Price I*").  "The more intense, lasting, or heinous the agony, the more likely it is to be torture."

*Id.* at 93.  In addition, the purpose of the torture must have at least some connection with the

interests or policies of the State.  *Id.* at 92 (citing J. Herman Burgers & Hans Danelius, The

United Nations Convention Against Torture 118–19 (1988)).

**2.**     **The Defendants' Abuse of Mr. Hekmati Constitutes Torture.**

Mr. Hekmati's declaration demonstrates that Iran's horrific and relentless abuse of

Mr. Hekmati for four-and-a-half years constitutes torture under the FSIA.  Consistent with the

**\*\*REDACTED DOCUMENT\*\***

definition of torture under the TVPA, the Defendants caused Mr. Hekmati both severe physical and mental pain, forced him to take mind-altering medication as a means to control him, and threatened his life regularly.

As Mr. Hekmati's declaration describes, the Defendants regularly beat, interrogated, threatened, and taunted Mr. Hekmati.  A. Hekmati Decl. ¶¶ 36–86.  The Defendants lied about the health of Mr. Hekmati's family and allowed him to live under the shadow of his own execution for months, even after his death sentence had been overturned.  *Id.* ¶¶ 44, 62–68.  For nearly two years, the Defendants subjected Mr. Hekmati to solitary confinement and extreme sensory deprivation.  *Id.* ¶¶ 36–72.  Even after Mr. Hekmati left solitary confinement, the Defendants continued to use pills and the threat of beatings to control and intimidate Mr. Hekmati, regularly beating and executing other prisoners in Mr. Hekmati's vicinity to provide him with a constant reminder of what his future might hold if he did not cooperate with Iranian officials.  *Id.* ¶¶ 74, 84.  The Defendants deprived Mr. Hekmati even of the most basic necessities, including proper food and medical care, and subjected him to horrific, unsanitary conditions during his entire four-and-a-half years in Evin Prison.  *Id.* ¶¶ 37–38, 49, 74–75, 81–83.  ███████████████████████████████████████████ ███████████████████████████████████████████  Such conduct rises above the level of "mere policy brutality" and "evidence[s] the degree of cruelty necessary" to constitute torture under the FSIA.  *Price I*, 294 F.3d at 94.[11]

---

[11] *See, e.g.*, *Moradi*, 77 F. Supp. 3d at 68–69 (finding that plaintiff held by Iranian Government for five-and-a-half months was victim of torture where captors "frequently subjected him to severe physical and mental pain, including threatening him with death and dismemberment, physically beating him, sexually assaulting him, and keeping him in excruciatingly painful positions for hours at a time during the interrogations . . . for the purpose of eliciting a false confession"); *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 425 (finding that plaintiff

**REDACTED DOCUMENT**

Even apart from the beatings and physical abuse Mr. Hekmati suffered, the heinous conditions and duration of his solitary confinement alone were sufficiently extreme to constitute torture. Courts and experts agree that extreme solitary confinement is a form of torture because of its lasting physical and psychological effects on detainees.[12]

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

who was struck on bottom of feet with cables, assaulted with Coke bottle, and hung in stress positions by Iranian Government during three-and-a-half-year imprisonment suffered torture); *Kilburn*, 699 F. Supp. 2d at 153 (finding that hostage held by Iranian-supported terrorist group for 16 months experienced torture in form of "beatings, unsanitary conditions, inadequate food and medical care, and mock executions"); *Massie v. Gov't of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 66, 74 (D.D.C. 2008) (finding that plaintiffs held by North Korea for 11 months were victims of torture where they were "provided inadequate rations of food and forced to live in unsanitary conditions" and subjected to "individual threats of death, threats to kill others, [and] severe beatings in order to coerce them into signing confessions"). Notably, all of these plaintiffs were imprisoned for less time than Mr. Hekmati.

[12] *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 687 (1978) (finding that conditions of confinement were cruel and unusual where prisoners were crowded into a windowless 8 by 10 foot cell with no furniture and deprived of the "basic necessities of light, heat, ventilation, sanitation, clothing and a proper diet") (citing *Finney v. Ark. Bd. of Corr.*, 505 F.2d 194, 208 (8th Cir. 1974)); *Wright v. McMann*, 387 F.2d 519, 521, 526 (2d Cir. 1967) (concluding that placing a prisoner in an unsanitary strip cell without adequate heat for 33 days and denying him "the use of soap, towel, toilet paper, tooth brush, comb, and other hygienic implements" constituted cruel and unusual punishment, and that such "subhuman conditions" could "only serve to destroy completely the spirit and undermine the sanity of the prisoner"); *Davenport v. DeRobertis*, 844 F.2d 1310, 1314–15 (7th Cir. 1988) (finding that placing prisoners in dirty, insect-infested solitary confinement cells approximately 5 by 10 feet with only a barred window amounted to cruel and unusual punishment); *Silverstein v. Fed. Bureau of Prisons*, 704 F. Supp. 2d 1077 (D. Colo. 2010) (finding cruel and unusual punishment where prisoners were subjected to bright light and camera surveillance 24 hours a day, barred from contact with fellow inmates, and kept in cells infested with rats); *see also* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y 325, 335–36 (2006); Peter S. Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 Crime and Justice 441 (2006). While the aforementioned courts describe these conditions as "cruel and unusual punishment," the Supreme Court has explained that the Eighth Amendment's prohibition against such cruel and unusual punishment encompasses torture. *See Furman v. Georgia*, 408 U.S. 238, 263–65 (1972) (citing *Wilkerson v. Utah*, 99 U.S. 130, 136 (1878)).

████████████████████████████████████████████████  Such

severe and long-lasting solitary confinement far exceeds these examples of confinement

condemned under U.S. law, and is banned even under Iranian law.  *See* Report of Mehdi Khalaji

¶ 15 ("Khalaji Rep.") (attached as Ex. F).  Accordingly, Mr. Hekmati's solitary confinement

constitutes torture under the FSIA, even apart from the other physical and psychological abuse

Mr. Hekmati suffered.

### 3. The Defendants Tortured Mr. Hekmati for the Purpose of Eliciting a False Confession and Extracting Concessions From the United States.

Consistent with the definition of torture under the FSIA, Mr. Hekmati has demonstrated

that the purpose of the torture was to "intimidate and coerce" him into making a false confession

that Iran could use to advance "the interests or policies of the [Iranian] State."  *See* TVPA § 3(b);

28 U.S.C. § 1350 note; *id.* § 1605A(h)(7).  Mr. Hekmati has further demonstrated that the torture

was "discriminatory," in that his abuse derived solely from the fact that he was a U.S. citizen and

thus a point of leverage through which Iran could seek concessions from the U.S.  *Id.*

As detailed above, Iranian officials privately and publicly indicated that Mr. Hekmati's

mistreatment was linked to Iran's desire for concessions from the United States.  A. Hekmati

Decl. ¶¶ 55, 79; B. Hekmati Decl. ¶¶ 4–5; *supra* n.5.  Mr. Hekmati himself was told continually

by his captors that the beatings and psychological abuse would cease if he confessed to working

for the CIA.  A. Hekmati Decl. ¶ 59.  Iran's cessation of torture and release of Mr. Hekmati was

in no way linked to any new evidence in the alleged "case" against him.  Rather, Iran's abuse of

Mr. Hekmati continued until he was released as part of the U.S.–Iranian prisoner exchange

detailed above.

Dr. Mehdi Khalaji, Senior Fellow at the Washington Institute for Near East Policy and an

expert on Iranian politics and jurisprudence, confirmed in his expert report that Iran engaged in

**REDACTED DOCUMENT**

unrelenting physical and psychological abuse of Mr. Hekmati solely "for political purposes of the Iranian regime."  Khalaji Rep. ¶ 34.  As. Dr. Khalaji explained, Iran's torture of Mr. Hekmati, including his prolonged solitary confinement, has no basis in Iranian law.  *Id.* ¶ 8. Rather, Iran's torture of Mr. Hekmati is just one of many examples of a policy and practice of the Iranian Government to seek political advantage through the mistreatment of Iranian-American dual citizens.  *Id.* ¶¶ 17–34.

### C.      Iran Engaged in Hostage-Taking as Defined By the FSIA.

The Defendants' wrongful arrest and imprisonment of Mr. Hekmati separately constitutes illegal hostage-taking.  "Hostage-taking" under the FSIA, as derived from Article 1 of the International Convention Against the Taking of Hostages (1979), is defined as follows:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage . . . .

*See* 28 U.S.C. § 1605A(h)(2).

Courts agree that "[t]he essential element of [a] hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the [C]onvention."  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359 (D.C. Cir. 2006) (quoting *Simpson I*, 326 F.3d at 234–35; *see also Price I*, 294 F.3d at 94).  The defendants must seek some "*quid pro quo*" arrangement whereby the hostage would be released "upon performance or non-performance of any action by that third party."  *Id.* (quoting *Price I*, 294 F.3d at 94).

As detailed above, Iran detained Mr. Hekmati on false espionage charges and, for four-and-a-half years, continuously threatened to kill, injure, and continue to detain him in an effort to compel the United States to release Iranians imprisoned in the United States or make other

**REDACTED DOCUMENT**

political or financial concessions to Iran.  Testimony from Mr. Hekmati and Dr. Khalaji demonstrates that Iran would release Mr. Hekmati only if the United States met its demands.  *See* Khalaji Rep. ¶¶ 7, 16–34.  Indeed, Iran ultimately released Mr. Hekmati when the United States released several Iranian prisoners from U.S. prison.[13]  Accordingly, Mr. Hekmati has demonstrated that Iran's conduct constituted hostage-taking as defined under the FSIA.

## V.   MR. HEKMATI'S INJURIES MEET THE GOVERNING STANDARD OF THE RESTATEMENT OF TORTS.

Where, as here, plaintiffs have asserted cognizable claims for terrorist acts under the FSIA, courts use traditionally-accepted common law standards to determine the nature of the injury plaintiffs have suffered.[14]  Under these common law standards, Iran's torture and hostage-taking of Mr. Hekmati constitute assault, battery, false imprisonment, and intentional infliction of emotional distress.

### A.   Assault and Battery

A party is liable for assault if its agents' acts were intended to cause a harmful or offensive contact with a person, or an imminent apprehension of such a contact.  Restatement

---

[13] Michael Pearson and Elise Labott, *Five Americans Released by Iran, Four as Part of Prisoner Swap*, CNN (Jan. 16, 2016), *available at* http://www.cnn.com/2016/01/16/middleeast/iran-jason-rezaian-prisoners-freed/; Laura Koran, *U.S. to Pay Iran $1.7 Billion in Legal Settlement*, CNN (Jan. 17, 2016), *available at* http://www.cnn.com/2016/01/17/politics/us-pays-iran-1-7-billion/.

[14] *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014) ("Based on the D.C. Circuit's guidance, district courts in this jurisdiction 'rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions' to define the elements and scope of these theories of recovery.") (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C.2012); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003); *Bluth v. Islamic Republic of Iran*, No. CV 12-250, 2016 WL 4491760, at *13 (D.D.C. Aug. 25, 2016); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010).

**REDACTED DOCUMENT**

(Second) of Torts § 21(1).  A party is liable for battery where its agents intentionally "cause a harmful or offensive contact" with a plaintiff.  *Id.* § 13.

It is well-established that hostage-taking and torture under the FSIA constitute assault and battery, as "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010).  Mr. Hekmati has established that his Iranian guards and interrogators acted with the intent to harm him when they regularly beat him, placed him in extremely painful positions for extended periods of time, whipped the bottom of his feet with cables, forced him to take mind-altering sedatives, and tased him in his kidneys.  A. Hekmati Decl. ¶¶ 41–43, 52–54.  Similarly, the Defendants repeatedly threatened Mr. Hekmati with death and other physical and psychological harm, causing him constant imminent apprehension that the Defendants were about to kill, torture, or otherwise abuse him.  *Id.* ¶¶ 55, 74, 84.

### B.    False Imprisonment

A party is liable for false imprisonment if its agents (a) confine a person with boundaries fixed by the agents, (b) the agents' actions result in directly or indirectly confining the victim, and (c) the victim is aware of the confinement.  Restatement (Second) of Torts § 35; *see also Massie*, 592 F. Supp. 2d at 76 (finding North Korea falsely imprisoned the plaintiffs when it "unlawfully detained and held [the plaintiffs] hostage against their will and without their consent").

Mr. Hekmati has demonstrated that Iran imprisoned him for four-and-a-half years based on a false conviction obtained through illegal means.  As explained by Iranian legal expert Dr. Khalaji, such confinement violated even Iran's own laws.  Khalaji Rep. ¶¶ 8–16.  Thus, Iran is liable for falsely imprisoning Mr. Hekmati.

**REDACTED DOCUMENT**

### C.        Intentional Infliction of Emotional Distress

A party is liable for intentional infliction of emotional distress when the party intentionally or recklessly causes severe emotional distress to another "by extreme and outrageous conduct."  Restatement (Second) of Torts § 46(1).  The conduct Mr. Hekmati has described is so severe and outrageous that it constitutes torture, and therefore satisfies the "extreme and outrageous" standard.  *See, e.g.*, *Massie*, 592 F. Supp. 2d at 76 ("All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally terror, in their targeted audience.") (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).  ████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████

## VI.    DAMAGES

### A.        Compensatory Damages

#### 1.        Pain and Suffering During Mr. Hekmati's Imprisonment

Courts in this district, including this Court, typically set damages for prolonged and abusive captivity at $10,000 per day for the pain and suffering that victims experienced while imprisoned.  *See, e.g.*, *Moradi*, 77 F. Supp. 3d at 70; *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005); *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 51 (D.D.C. 2001).  Here, Mr. Hekmati was held by Iran for 1,602 days.  Accordingly, Mr. Hekmati seeks $10,000 per day for the pain and suffering he experienced while in prison, for a total of $16,020,000.

2.      **Post-Release Pain and Suffering**

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

Courts commonly award damages for post-imprisonment pain and suffering where a plaintiff's per diem award does not sufficiently account for the harm the plaintiff has suffered or will continue to suffer for the rest of his or her life.  In particular, courts have awarded higher post-imprisonment damages in cases where, as here, the plaintiff was young, and thus will continue to suffer harm for many years, and where the duration of the plaintiff's imprisonment was long.

For example, in *Massie*, the court awarded each plaintiff $13,400,000 for the "physical and mental harm [the plaintiffs] have endured . . . and likely will continue to endure through the rest of their lives" as a result of their captivity in North Korea.  592 F. Supp. 2d at 77.  This amount was equal to four times the per diem award the plaintiffs already had received for each day of their imprisonment.

Iran's actions warrant a similar four-times multiplier for Mr. Hekmati's ongoing psychological harm.  Like the plaintiffs in *Massie*, Mr. Hekmati was subjected to extreme levels of physical and psychological torture, ███████████████████████████████████

████████████████████      Like the *Massie* plaintiffs, Mr. Hekmati was beaten regularly (*Massie*,

28

592 F. Supp. 2d at 63–64; A. Hekmati Decl. ¶¶ 41, 51, 64), constantly threatened with execution (*Massie*, 592 F. Supp. 2d at 64; A. Hekmati Decl. ¶¶ 44, 62–68), forced to live in grossly unsanitary conditions (*Massie*, 592 F. Supp. 2d at 64–65; A. Hekmati Decl. ¶¶ 37–38, 75, 81–83), and severely malnourished (*Massie*, 592 F. Supp. 2d at 64; A. Hekmati Decl. ¶¶ 49, 74). Like the *Massie* plaintiffs, Mr. Hekmati's captors tortured him in order to elicit a false confession. *Massie*, 592 F. Supp. 2d at 65; A. Hekmati Decl. ¶¶ 43–44.  However, Mr. Hekmati was held for a far longer period of time than the *Massie* plaintiffs (1,602 days versus 335 days). In addition, the *Massie* plaintiffs, while prohibited from talking to one another, shared physical space with each other, which allowed them to see each other and to communicate. *Massie*, 592 F. Supp. 2d at 66–68.  In contrast, Mr. Hekmati was subjected to total solitary confinement for 18 months.  A. Hekmati Decl. ¶ 26.

Consistent with *Massie*, an award of $64,080,000, which is equal to four times the amount of Mr. Hekmati's per diem award for his time in prison, appropriately accounts for Mr. Hekmati's post-release pain and suffering.[15]

Other cases in this district support similarly high awards for post-release compensatory damages.  In *Stansell v. Republic of Cuba*, No. 15-CV-01519 (APM), 2016 WL 6581171, at *15–16 (D.D.C. Nov. 4, 2016), the court found that an award of $19,670,000 to each of the

---

[15] In *Moradi*, this Court awarded a plaintiff who was tortured and held hostage in Iran $5 million for post-release pain and suffering. 77 F. Supp. 3d at 70.  The Court concluded that an award equal to four times the plaintiff's per diem award, like that the court had awarded in *Massie*, was inappropriate in part because the victims in *Massie* were held for a longer period of time than the plaintiff (335 days versus 168 days) and the victims in *Massie* were younger at the time of their release, exposing them to many more years of post-release suffering. *Id.*  Here, Mr. Hekmati was held for far longer than the *Massie* plaintiffs (1,602 days) in far more severe conditions. Like the *Massie* plaintiffs, he was a young man at the time of his release ███████ ████████ Thus, Mr. Hekmati should be entitled to an award at least equal to the four-times-multiplier used by the *Massie* court for his post-release pain and suffering.

plaintiffs for the 1,967 days they were tortured and held hostage by the Revolutionary Armed

Forces of Colombia was insufficient to account for their past and future pain and suffering.

Accordingly, the court awarded an additional lump sum of $25 million to each plaintiff, for total

compensatory damages of $44,670,000 per plaintiff.

Like the *Stansell* plaintiffs, Mr. Hekmati was confined far longer than most FSIA

plaintiffs, thus rendering a per diem award alone insufficient.  Should the Court choose not to

apply the four-times multiplier used in *Massie*, Mr. Hekmati should be entitled to an additional

lump sum of $25 million to account for his future pain and suffering.  *See also Acree v. Republic*

*of Iraq*, 271 F. Supp. 2d 179, 220 (D.D.C. 2003), *vacated on other grounds*, 370 F.3d 41 (D.C.

Cir. 2004) (awarding $20 million in pain and suffering and $7 million in post-captivity pain and

suffering to plaintiff-POWs who had been captured and tortured in Iraq for periods ranging

between 21 and 47 days, for a total compensatory award of $27 million per plaintiff).

**B.    Economic Damages**

The FSIA also provides for recovery of economic damages.  28 U.S.C. § 1605A(c).  "As

a general rule, lost earning—past and future—are compensable economic damages."  *Moradi*, 77

F. Supp. 3d at 71 (citing Restatement (Second) of Torts § 906).  "Loss in earning capacity may

result from an imprisonment or from a harm to the body, as when there is a physical impairment,

from harm to the mind, as when the injured person suffers a nervous shock."  *Id.*  To obtain an

award of economic damages, plaintiffs "must prove the amount of damages by a reasonable

estimate."  *Id.* (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C.

2012).

30

**\*\*REDACTED DOCUMENT\*\***

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Based on the abovementioned expert testimony, Dr. Frank Slesnick, a forensic economist, concluded that Mr. Hekmati's past and future lost earnings will total $5,728,179.  *See* Expert Report of Frank Slesnick, PhD ¶ 46 (attached as Ex. G).  Dr. Slesnick's conclusions are based on assumptions that Mr. Hekmati would have completed graduate school as planned, obtained a position consistent with his master's degree in economics, and earned a salary comparable to that of other similarly-situated individuals in his profession.  *Id.*  ¶¶ 44–46.

Accordingly, Mr. Hekmati asks the Court to award him a total of $5,728,179 in economic damages.

### C.    Punitive Damages

Finally, Mr. Hekmati seeks punitive damages of $300 million.  Punitive damages are appropriate in cases involving "outrageous conduct."  Restatement (Second) of Torts § 908(1). The purpose of such damages is "to punish and deter the actions for which they are awarded." *Moradi*, 77 F. Supp. 3d at 73 (quoting *Oviessi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55–56 (D.D.C. 2012).  Courts calculate the proper amount of punitive damages by considering "four factors:  (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Id.* (quoting *Oviessi,* 879 F. Supp. 2d at 56).

Here, the character of the Defendants' acts and the extent of harm the Defendants caused Mr. Hekmati is sufficiently "outrageous" to warrant the imposition of punitive damages.

**REDACTED DOCUMENT**

Mr. Hekmati was held in extreme solitary confinement, beaten, threatened, deprived of adequate food and sanitary conditions, and psychologically battered by his captors for nearly five years.

█████████████████████████████████████████

Iran's conduct is consistent with a pattern and practice of imprisoning U.S.–Iranian citizens under false pretenses and subjecting them to extreme physical and psychological abuse during their detention.  Khalaji Rep. ¶¶ 18–34.  Thus, the "societal interest in punishment and deterrence [of Iran's behavior] warrant imposition of punitive sanctions." *Osongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 153 (D.D.C. 2014).  Indeed, experts in similar cases under the FSIA have testified that Iran might construe failure to impose substantial punitive damages as capitulation by the United States in the debate over hostage-taking and torture.  *See, e.g.*, *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 53 (D.D.C. 2001).

Courts commonly have awarded high punitive damages against Iran in cases where plaintiffs have alleged similarly heinous conduct.  Specifically, a number of courts have awarded $300 million in punitive damages in cases where plaintiffs suffered harm at the hands of MOIS on the basis that such an award is equal to three times the amount of annual funding provided by Iran to MOIS.  *See, e.g.*, *id.*; *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 114 (D.D.C. 2000); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 34 (D.D.C. 1998).

Here, Mr. Hekmati has provided testimony that two of the three wards in which he was imprisoned were operated directly by MOIS, and that his interrogators were MOIS officials.[16]  MOIS's direct participation in Mr. Hekmati's fabricated arrest, detention, and torture,[17] along

---

[16] *See* pp. 2, 3 n.1, 7 n.2–3, *supra*; A. Hekmati Decl. ¶¶ 32, 26, 56.

[17] In *Moradi*, this Court declined to award the full $300 million in punitive damages because the *Moradi* plaintiff's detention was "carried out directly by Iranian authorities," whereas plaintiffs who had been awarded $300 million in punitive damages had suffered harm at the hands of

**REDACTED DOCUMENT**

with the particularly horrendous nature of Mr. Hekmati's treatment and the Iranian Government's increasing use of hostage-taking and torture of U.S. citizens for political purposes, warrants the imposition of a similar $300 million award for punitive damages.

Alternatively, other courts have awarded punitive damages in an amount equal to a plaintiff's total compensatory damages. *See, e.g.*, *Moradi*, 77 F. Supp. 3d at 72; *Onsongo*, 60 F. Supp. 3d at 152–53; *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 80–82 (D.D.C. 2014). Accordingly, should this Court decline to apply the expenditure-times-multiplier approach, Mr. Hekmati respectfully requests that the Court award punitive damages in an amount equal to Mr. Hekmati's total compensatory damages.

## CONCLUSION

Amir Hekmati spent his young life serving his country.  He was in the midst of building a bright career and a happy family when he traveled to Iran in 2011.  Four-and-a-half years later, he left Iran a shadow of his former self, with his dreams dashed and his future destroyed. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████

Mr. Hekmati can never recoup the years he lost in Evin Prison or the life the Defendants took from him, but it is well-established under U.S. law that he is entitled to compensatory damages for the horrors he suffered and continues to suffer, and to punitive damages to deter Iran from taking similarly egregious action in the future.  Mr. Hekmati has demonstrated his right to the relief he seeks and respectfully requests that the Court grant that relief.

---

groups supported by MOIS.  77 F. Supp. 3d at 73.  Mr. Hekmati's case is distinguishable from *Moradi* in that Mr. Moradi, unlike Mr. Hekmati, did not provide evidence that MOIS officials carried out his harm.

**REDACTED DOCUMENT**

Dated:  February 6, 2017

Respectfully submitted,


/s/ Emily P. Grim

Scott D. Gilbert (D.C. Bar #290932)
Mark A. Packman (D.C. Bar #336321)
Emily P. Grim (D.C. Bar #1006597)
Gilbert LLP
1100 New York Avenue NW
Suite 700
Washington, DC 20005
Tel:  (202) 772-2200
Fax:  (202) 772-3333

*Attorneys for Plaintiff Amir Hekmati*

34

**\*\*REDACTED DOCUMENT\*\***