# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
AMIR HEKMATI,                          )
)
    Plaintiff,                         )
)
       v.                            )      Civil Action No. 16-0875 (ESH)
)
ISLAMIC REPUBLIC OF IRAN,              )          **<u>REDACTED</u>**
)
    Defendant.                         )
_____)


## <u>MEMORANDUM OPINION</u>

Plaintiff Amir Hekmati, a United States citizen, spent four and one-half years in Evin prison in the Islamic Republic of Iran ("Iran").  He brings this action for compensatory and punitive damages against Iran under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611, alleging that Iran's detention of him and treatment while detained constituted hostage taking and torture.  (Compl., May 9, 2016, ECF No. 1.)  Iran failed to respond to the complaint, the Clerk entered a default, and plaintiff has now moved for a default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2).  (Mot. for Default Judgment, Feb. 6, 2017, ECF No. 12.)  For the reasons set forth herein, the Court will grant the motion for default judgment.

## BACKGROUND

### I.    FINDINGS OF FACT

The evidence in the record before the Court establishes the following facts.

Amir Hekmati is a dual U.S.-Iranian citizen who was born in the United States in 1983.

(Proposed Findings of Facts and Conclusions of Law in Support of Mot. for Default Judgment

("Mem.") Ex. A (Decl. of Amir Hekmati ("Hekmati Decl.")) ¶¶ 1, 3.) His parents, Ali and

Behnaz Hekmati, had immigrated to the United States from Iran before he was born. (*Id.* ¶ 3.)

He has three siblings--an older sister, a twin sister, and a younger brother. (*Id.* ¶ 4.) When he

was eight years old, his family moved to Flint, Michigan, and he lived there until he graduated

from high school in 2001. (*Id.* ¶¶ 7-8.)

From July 2001 until August 2005, Hekmati served in the United States Marine Corps.

(*Id.* ¶ 9, Ex. A.) While in the Marines, he completed a 63-week course in Arabic at the Defense

Language Institute in Monterey, California, graduating with high honors in May 2003. (*Id.* ¶ 10,

Ex. C.) Thereafter, he was deployed to Iraq as an infantry rifleman to support combat

operations; he also served as the personal interpreter for the battalion commander. (*Id.* ¶ 11, Ex.

D.) After completing his four-year term of active service, during which he reached the rank of

E-5/SGT, he was honorably discharged in August 2005. (*Id.* ¶¶ 9, 12, Ex. A.) After leaving the

military, Hekmati worked as a defense contractor in the areas of language and cultural

instruction, with a focus on new language translation technology. (*Id.* ¶¶ 14-16, 18.) He also

went to college online, obtaining a bachelor's degree in International Business Management in

2009 from the University of Phoenix. (*Id.* ¶ 17.)

In 2009, Hekmati was hired as a research manager for a U.S. defense contractor, which

led to his spending a year in Iraq, providing cultural analysis and advice to U.S. military

commanders. (*Id.* ¶ 19.) In May 2011, he started a new job in Afghanistan as an analyst for

another U.S. defense contractor. (*Id.* ¶ 20.) Shortly thereafter, though, he was accepted into a

Master's Program in Economics at the University of Michigan, and he decided to enroll. (*Id.* ¶¶

21-22.) Before returning to the United States, he decided he would take his first trip to Iran to

visit relatives and see the country of his parents' birth. (*Id.* ¶ 25.)

## A.     Iran

Hekmati received authorization to travel to Iran from the Iranian Interests Section of the Pakistani Embassy in Washington, D.C., and he arrived at the airport in Tehran on August 14, 2011.  (*Id*. ¶¶ 27-28.)  After a brief interview with immigration officials, he was admitted to the country using his Iranian passport.  (*Id*. ¶ 28.)  On August 29, 2011, two days before his scheduled departure, two men who represented themselves as being from a passport control agency appeared and asked him to come with them to answer a few additional questions.  (*Id*. ¶ 30.)  They took Hekmati to a small office building nearby, where he was questioned by men from the Iranian Ministry of Intelligence and Security ("MOIS").  (*Id*. ¶¶ 31-32.)  MOIS is Iran's primary intelligence organization; in 2012, it was designated by the United States Department of the Treasury for human right abuses dating back to June 12, 2009.  *See* U.S. Dept. of Treasury, *Treasury Designates Iran Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism*, U.S. Dept. of Treasury Press Center (Feb. 16, 2012) ("Treasury Designation") ("The U.S. Departments of the Treasury and State also today imposed sanctions against MOIS pursuant to E.O. 13553 for being responsible for or complicit in the commission of serious human rights abuses against the Iranian people since June 12, 2009.")

Hekmati was asked why he was in Iran, and he told them he was there "[t]o visit Iran." (Hekmati Decl. ¶ 31.)  He was also asked to write down the names of his family members, which he did.  (*Id*.)  Then he was ordered to write down that he was a former member of the U.S. military.  (*Id*.)  Once he did that, the interrogator asked him to sign the paper, which he did.  (*Id*. ¶ 32.)  After Hekmati signed the paper, the interrogator began to call him a "spy" and threatened that he would be taken to "a very bad place" if he did not confess.  (*Id*. ¶ 33.)  He told the interrogator that he had no idea what he was talking about, but ultimately, two guards handcuffed Hekmati and took him to Evin Prison.  (*Id*. ¶¶ 33-34.)

**B.    Detention**

"Evin Prison in Tehran [is] notorious for cruel and prolonged torture of political opponents of the government."  U.S. Dep't of State, Iran 2012 Human Rights Report at 7.  When Hekmati first arrived at Evin, he was strip-searched, given blue prison pajamas, blindfolded, and taken to a small, windowless cell in Ward 209, which was controlled by MOIS.  (Hekmati Decl. ¶¶ 34, 36); *see also* Iran 2012 Human Rights Report at 7 ("news organizations and human rights groups reported [that Ward 209] was under the control of the country's intelligence services"); Treasury Designation at 1 ("MOIS agents are responsible for the beatings, sexual abuse, prolonged interrogations, and coerced confessions of prisoners, particularly political prisoners, which occurred in Ward 209 of Evin Prison, which is controlled by MOIS, following the June 2009 elections in Iran.")

Hekmati describes his first few days in Ward 209 as a "blur."  (Hekmati Decl. ¶ 35.)  He was "shocked, confused, scared, [and] indignant."  (*Id*.)  He did not know if what had happened was all a "misunderstanding" or if "prison official were about to blow [his] head off."  (*Id*. ¶ 35.)  As it turned out, Hekmati spent the next four months in his cell in solitary confinement.  (*Id*. ¶ 36.)  His cell was so small that he could not fully extend his legs when he was lying down.  (*Id*. ¶ 37.)  The walls were curved, making him "feel constantly like the walls were caving in" on him.  (*Id*.)  The "floor was cold tile covered with a thin carpet," and that is where Hekmati slept as there was no mattress.  (*Id*.)  Hekmati was given a thin blanket, but it did little to protect him from the cold floor.  (*Id*.)  "There was nothing else in the cell except a small makeshift toilet, which was more like a pail with a hose."  (*Id*. ¶ 38.)  "There was no plumbing and no toilet paper."  (*Id*.)  The prison official kept bright lights on 24 hours a day, making it impossible for Hekmati, in his windowless cell, to tell if it was daytime or nighttime.  (*Id*. ¶ 39.)  "At other times, the power went out, and [he] was left in complete darkness for hours at a time."  (*Id*.)

When that happened, Hekmati felt like he was "being buried alive." (*Id.*) He was served very little food—a slice of bread and margarine in the morning, soggy rice and lentils for lunch, and a small cup of soup or lentils in the evening. (*Id.* ¶ 49.) He rapidly lost a significant amount of weight – by his estimate, over 20 pounds. (*Id.*) Hekmati was permitted to leave his cell "only once every few days for 10–15 minutes to take a cold shower." (*Id.* ¶ 40.) Otherwise, he was "taken from [his] cell only for interrogations, which . . . happened every few days." (*Id.*) He was always blindfolded when he was taken out of his cell. (*Id.*)

While Hekmati was in Ward 209, he was frequently subjected to physical and psychological abuse. For example, "[p]rison officials intentionally exacerbated [Hekmati's discomfort] by regularly pouring water on the floor of [his] cell so that it remained cold and damp and grew moldy," a smell he describes as "putrid." (*Id.* ¶ 37.) "At times, the air was so heavy and polluted that [Hekmati] had trouble breathing" and, in fact, "the guards [had to wear] surgical masks." (*Id.* ¶ 38.) In addition, "[p]rison guards beat [him] repeatedly with batons and struck [him] in [his] kidneys with an electric taser." (*Id.* ¶ 41.) On one occasion, an interrogator "chained [him] to a table blindfolded and whipped the bottom of [his] feet with cables as punishment for not giving him the answers he wanted." (*Id.* ¶ 42.) Hekmati describes these "whippings" as "excruciating." (*Id.* ("Because I could not move, I felt the pain not just on my feet, but reverberating through my head, like a screwdriver jammed into my brain.").) Also, because the wounds were on his feet, they were slow to heal; his feet became swollen, and he could not walk properly. (*Id.*) On multiple occasions, he "was handcuffed in stress positions for hours at a time." (*Id.* ¶ 43.) Such as on one occasion, he "was handcuffed with one arm reaching behind [his] shoulder and the other hand meeting it behind [his] back for nearly forty-eight hours," a position that prevented him from sitting the entire time and caused "excruciating" pain

in his shoulder. (*Id.*) The prison guards also constantly taunted and belittled him, insulting him, his mother, and his country. (*Id.* ¶ 44.) On one occasion, prison officials lied and told him that his sister had been involved in a terrible car accident, but then refused him access to a phone to call his family unless he confessed that he was a spy. (*Id.*) He "worried every day about [his] mother, who [he] knew must be desperate to find [him]." (*Id.* ¶ 45.)

Hekmati's "physical and psychological health deteriorated rapidly," to the point where he thought he "was truly losing [his] mind." (*Id.* ¶ 51.) Initially, he completely lost track of time and just stared at the wall all day. (*Id.* ¶ 46.) Next, he "began talking to the walls, as if they were a family member or friend from home." (*Id.* ¶ 47.) Eventually, he felt that the "walls were caving in on [him] and that [he] couldn't breathe." (*Id.* ¶ 51.) He had "numerous panic attacks," during which he "would start banging and clawing at the door, screaming for the guards. (*Id.*) His distress "was met only with taunts and more beatings." (*Id.*) He often thought about suicide. (*Id.*)

"Roughly three months into [Hekmati's] solitary confinement, the guards started forcing [him] to take sedatives." (*Id.* ¶ 52.) "The sedatives made it even harder to keep track of time." (*Id.*) He "drifted in and out of consciousness," a state he describes as like "a living corpse." (*Id.*) Hekmati resisted the pills initially, but "they quickly became [his] lifeline," as they "allowed [him] to feel numb." (*Id.* ¶ 53.) Once Hekmati was "hooked on the pills . . . [his] interrogator used them as a means of controlling [him]." (*Id.* ¶ 54.) He "would cut off the pills abruptly to attempt [to] coerce [Hekmati] to do things or say things that were untrue." (*Id.*) Hekmati "felt out of control when the pills were taken from [him]"; he "stopped sleeping and started experiencing panic attacks again"; he "felt [he] would do anything to get more pills." (*Id.*)

Hekmati was "told that all of these abuses would continue for as long as it took [him] to confess to being a spy sent to Iran by the CIA to collect intelligence and spread pro-U.S. propaganda." (*Id.* ¶ 55.) He was also told "on numerous occasions" that "'[his] Government'— meaning the United States—needed to 'cooperate' if [he] was to be released." (*Id.*) In light of these statements, Hekmati concluded "shortly after [his] arrest," "that he was being used as a pawn by the Iranian Government to spread anti-U.S. propaganda and to win concessions from the U.S. Government." (*Id.*)

In December 2011, after four months in solitary confinement, Hekmati was dressed in civilian clothes and transported to a local hotel, where he was given food, cigarettes, and more pills, and "told that [he] would be released immediately if [he] agreed to be interviewed for an internal training video for MOIS" and to "state that [he] had been sent to Iran by the CIA." (*Id.* ¶ 56.) Hekmati initially refused, but after his interrogators "swore on the Koran that the video was only for internal training purposes," he eventually decided "to comply in hopes of being released." (*Id.* ¶ 57.) Hekmati was not released. Rather, he was returned to solitary confinement in Ward 209. (*Id.* ¶ 59.) He later learned that the Iranian Government "broadcast [his] false 'confession' on Iranian state television as 'proof' of [his] crimes." (*Id.*)

In January 2012, Hekmati was tried by Iran's Revolutionary Court. He was not informed of the charges against him, and he only met his court-appointed defense counsel five minutes before the trial began. (*Id.* ¶ 61.) After a 15-minute proceeding behind closed doors, he was convicted of "espionage, waging war against God, and corrupting the earth." (*Id.* ¶ 62.) A month later, he learned from a newspaper article, shown to him by the prison guards, that he had been "sentenced to death, to be executed immediately by hanging." (*Id.* ¶¶ 62-63.)

After receiving his death sentence, Hekmati was kept on Ward 209, but moved to a

"suite"—"two solitary confinement cells with the dividing wall removed." (*Id.* ¶ 64.) Other than

that change, the physical and mental mistreatment continued. (*Id.*) He still had "no phone, no

visits, no lawyer, and no reading material." Added to that was a death sentence that "haunted

[him] day in and day out," such that he woke up every day "wondering if it was [his] execution

day." (*Id.* ¶ 65.) Hekmati lived "in a constant state of fear and anxiety." (*Id.*) He "started

having nightmares and more frequent panic attacks." He heard "other prisoners being dragged

from their cells to be executed" and those screams continue to haunt him. (*Id.*) Hekmati "could

feel whatever mental strength [he] had left begin to crumble." (*Id.* ¶ 66.) He "stopped sleeping";

he "stopped eating"; he "paced [his] cell at all hours"; and he "was hypervigilant, paranoid that

[his] executioners were about to arrive." (*Id.*) He had "constant visions of [his] execution and

death." (*Id.*)

After several months on death row, Hekmati was taken back to the Revolutionary Court

for a new trial – before a different judge – because an Iranian appeals court had "overturned [his]

death sentence based on insufficient evidence." (*Id.* ¶ 67.) The second trial was also held behind

closed doors, and it lasted no more than 10 minutes. (*Id.*) Months later Hekmati learned, again

through a newspaper shown to him by prison guards, that he had been convicted of cooperating

with a hostile government and sentenced to 10 years in Evin Prison.[1] (*Id.* ¶ 68.)

By this time, Hekmati had spent nearly a year in solitary confinement. (*Id.* ¶ 70.)

Although he "felt some relief when [his] death sentence was annulled, . . . [he] knew the courts

could re-instate the sentence at any time." (*Id.*) Thus, his fear of execution "festered, never

really going away," and he "continued to live for [his] daily dose of pills." (*Id.*)

---

[1] Hekmati also learned later that before the trial his mother had secretly wired $20,000 to his
court-appointed attorney in exchange for which the attorney had promised that Hekmati would
receive only a one-year sentence. (Hekmati Decl. ¶ 69; Behnaz Hekmati Decl. ¶ 6.)

Hekmati could not bear the thought of spending 10 more years in solitary confinement, and he went on multiple hunger strikes to protest his conditions. (*Id.* ¶ 71.) Eighteen months into his imprisonment, he lost consciousness after a prolonged hunger strike, fell, and suffered a head injury. (*Id.* ¶ 72.) At that point, Iranian officials transferred him out of Ward 209 to a political prison in Ward 350. (*Id.*)

When Hekmati arrived in Ward 350, he saw his reflection for the first time in eighteen months, and he "didn't recognize the face staring back" at him. (*Id.* ¶ 73 ("I was pale and drawn. My eyes were sunken and had dark circles under them. A thick beard covered the hollows of my face.").) Although he was no longer in solitary confinement, conditions in Ward 350 were "terrible": there were "20–30 prisoners . . . packed together in a small cell"; "[e]veryone had physical and psychological problems"; "[t]here were no beds[--]only pieces of wood suspended from the wall"; prisoners "were regularly dragged out of the cell for execution or beatings"; and "[t]he guards indicated that prisoners would be helped if they snitched on other prisoners, so there was a constant atmosphere of fear and distrust among the population." (*Id.* ¶ 74.) "Tensions ran high," so Hekmati tried to keep to [him]self." (*Id.*) Although "Ward 350 had a small courtyard where [prisoners] could see a small patch of sky," it was so small that Hekmati "could do little more than move in tight circles." (*Id.* ¶ 75.) In addition, prison officials stopped giving Hekmati his pills, causing him months of painful withdrawal symptoms. (*Id.* ¶ 74.)

While in Ward 350, Hekmati still was not allowed to use the phone or to speak to a lawyer, diplomatic officials, or his family back home, but he was allowed to meet with his uncle once a month for 20–30 minutes. (*Id.* ¶ 76.) It was then that he learned that his father, after learning about Hekmati's death sentence, had suffered a major stroke, followed by a diagnosis of advanced brain cancer. (*Id.* ¶ 77.) His father at that point had lost his mobility and could no

longer care for himself.  (*Id.*)  In addition, Hekmati's older sister had quit her job to lobby full-time for his release, despite having two young children at home, and his family was spending tens- of-thousands of dollars on lawyer fees and expenses to lobby for his release.  (*Id.*)  Hekmati had been in Ward 350 for about a year and a half when there was a "huge riot," and "[a]s punishment," he (and others) "were transferred to the general population prison."  (*Id.* ¶ 80.)

In the general prison population, Mr. Hekmati was assigned to Ward 7, where he was housed with drug dealers and other violent criminals.  (*Id.*)   He describes the conditions there as "some of the most brutal he had faced in his three years at Evin":  his "'cell' was actually a basement typically used to quarantine sick prisoners"; there were again 20–30 prisoners packed into a small space; "[t]he cell was infested with rats," which Hekmati and the other prisoners "had to kill [them]selves using broomsticks or other blunt objects"; "[t]here were no beds"; his "skin was eaten by lice and fleas"; he "would wake up with bed bugs all over [him]"; and when prison officials would occasionally spray the room with chemicals to get rid of the bed bugs, the chemicals "made the prisoners sicker than the bug bites did."  (*Id.* ¶ 81.)  In addition, the ward "had no heat, air conditioning, or ventilation"; "[t]there was no courtyard or outdoor recreational space"; "[t]here were no toilets," just "three holes in the ground with a hose next to them"; "[t]he showers were directly next to the toilet holes" and, "because of the terrible ventilation, the showers became a breeding ground for infection."  (*Id.* ¶ 82.)  Prisoners were given a surgical mask to wear in the shower, but each only got one mask, so masks quickly became filthy.  (*Id.*)

Hekmati was sick the entire time he was in Ward 7 from "recurring lung and sinus infections and constant intestinal problems."  (*Id.* ¶ 83.)  "Prison officials would ignore [prisoners'] ailments unless they had a high fever, which they would 'treat' by injecting [them] with steroids that actually suppressed the immune system, making the infection worse."  (*Id.*)

Hekmati eventually stopped requesting any medical treatment.  (*Id.*)

Hekmati "lived in constant fear of [the] other prisoners in Ward 7."  (*Id.* ¶ 84.)  Prison officials would put violent criminals in the cell to pressure political prisoners like Hekmati to confess or swear allegiance to the Iranian Government.  (*Id.*)  These prisoners would beat other prisoners; one prisoner's face was torn apart by a razor blade.  (*Id.*)  Many of the political prisoners who had been transferred to Ward 7 with Hekmati suffered mental breakdowns from the trauma of the surroundings.  (*Id.*)  Hekmati "tried not to make trouble"; his "only goal was to stay alive."  (*Id.*)  The only bright spot was that Hekmati finally was permitted to call his family.  (*Id.* ¶ 85.)  But his phone access was limited to 5–10 minutes per day, and the news from his family was "always disheartening."  (*Id.* ¶¶ 85-86.)  His father's health was "getting worse," and his mother was "clearly struggling to take care [of him]."  (*Id.*)

C.  **Release & Post-Release**

In January 2016, Hekmati was taken from his cell in Ward 9 back to Ward 209, where he met with a prosecutor, who told him that he would be released if he "expressed regret over [his] actions."  (*Id.* ¶ 87.)  Hekmati refused, but nonetheless he was taken to the airport and, on January 16, 2016, put on a plane leaving Iran.  (*Id.* ¶¶ 87-88.)  As Hekmati later learned, Iran had released him and three other imprisoned Americans in exchange for clemency for seven Iranians indicted or imprisoned in the United States for sanctions violations.  (*Id.* ¶ 89); *see also, e.g.,* Michael Pearson and Elise Labott, *Five Americans Released by Iran, Four as Part of Prisoner Swap*, CNN (Jan. 16, 2016), *available at* http://www.cnn.com/2016/01/16/middleeast/iran-jason-rezaian-prisoners-freed/index.html.

After Hekmati returned to the United States, he continued to suffer from his detention.  Prior to his imprisonment, Hekmati was an energetic and hardworking young man, with plans to go to graduate school, get married, and start a family.  (Hekmati Decl. ¶¶ 91-92; s*ee also* Mem.

Ex. C (Decl. of Behnaz Hekmati ("Behnaz Hekmati Decl.")) ¶¶ 7-30; Mem. Ex. D (Decl. of

Sarah Hekmati ("Sarah Hekmati Decl.")) ¶¶ 2-15.)  After his return, he was ██████████

██████████████████████████████████████████████████████████████████████

████████████████████████████ (Hekmati Decl. ¶ 91; Behnaz Hekmati Decl. ¶¶ 7-30; Sarah

Hekmati Decl. ¶¶ 2-15.) ████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████ (Hekmati Decl. ¶¶ 94-95.) █████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████ (*Id.* ¶ 95.) ████████████████████

██████████████████████████████████████████████ (*Id.* ¶¶ 97-99.) █████

██████████████████████████████████ (Behnaz Hekmati Decl. ¶ 17.) █████████

█████████████████████████████████████████████████████████████████████

██████████████████████ (Hekmati Decl. ¶¶ 100-101; *see also* Behnaz Hekmati Decl. ¶¶

27-30; Sarah Hekmati Decl. ¶¶ 13-14.) █████████████████████████████████████

██████████████████████████████████████████████████ (Hekmati Decl. ¶

102; Behnaz Hekmati Decl. ¶ 19; Sarah Hekmati Decl. ¶ 15.)

Dr. Stuart Grassian, M.D., who was retained as an expert to evaluate Hekmati "in

relationship to the psychiatric effects of his imprisonment," has diagnosed Hekmati as █████

████████████████████████████████████████████████ (Mem. Ex. B (Expert Report of

Stuart Grassian, M.D. ("Grassian Rep.")), at 1)[2] ████████████████████████████████

---

[2] Dr. Grassian is a Board-certified psychiatrist, licensed to practice medicine in the
Commonwealth of Massachusetts, with "extensive experience in evaluating the psychiatric
effects of solitary confinement, of confinement under the sentence of death, and of harsh and
sadistic interrogation practices."  (Grassian Rep. at 1-2.)  He prepared his expert report after
interviewing Hekmati for over 8 hours in August 2016, and reviewing relevant documents,

██████████████████████████████████████████

████████ ; *see also* Hekmati Decl. ¶ Ex. F (Letter from Dr. Katherine Porter, VA Ann Arbor

Healthcare System, Aug. 9, 2016)████████████████████████████

██████████████████████████████████████████

████████████████████████████████ (*See* Grassian Rep. at 16-17.)

### D.    Iran's Purpose in Detaining Hekmati

According to Dr. Mehdi Khalaji, Hekmati was detained "at the direction, and with the

active participation, of the Iranian government" and as "part of a policy and practice of the

Iranian government to seek political advantage through the mistreatment of Iranian-American

dual citizens." (Mem. Ex. F (Expert Report of Dr. Mehdi Khalaji ("Khalaji Rep.")), ¶¶ 7, 34-

35)[4]; *see also* Opinions Adopted by the United Nations Working Group on Arbitrary Detention,

No. 28/2013 (Aug. 2013), *available at* http://hrlibrary.umn.edu/wgad/28- 2013.html (finding Mr.

Hekmati's detention arbitrary and in contravention of the Universal Declaration of Human

Rights and the International Covenant on Civil and Political Rights). Specifically, Iran's

purposes in detaining Hekmati, and other Iranian-Americans detained during the same period,

---

which are identified therein. (*Id*. at 4.)

[3] Stupor and delirium is a disorder which is characterized by symptoms of disorientation, hallucinations, severe anxiety, panic attacks, and claustrophobia, and it is typically seen only in prisoners held in solitary confinement. (Grassian Rep. at 5–9.)

[4] Dr. Mehdi Khalaji is a Senior Fellow at the Washington Institute for Near East Policy and the CEO at The Idea Center for Arts and Culture. (Khalaji Rep. ¶¶ 1-3.) He holds a doctoral degree in Shiite theology and exegesis from the University of Sorbonne in Paris, France and a master's degree in Western Philosophy from the University of Tarbiat Modarres in Qom, Iran. (*Id*. ¶4.) His complete curriculum vitae is attached to his expert report. (*See id*., Ex. A.). He previously testified as an expert in *United States v. Lahiji*, 3:10-cr-00506 (D. Or. 2013). (*Id*. ¶ 5.) In addition to Hekmati, Dr. Khalaji identifies and discusses seven other incidents between 2007 and 2016 where Iranian-American citizens were detained in order "to threaten U.S. interests and to advance the political interests of the Iranian state." (Khalaji Rep. ¶¶ 16-33.)

and others like him, included "coercing . . . false confessions that they had taken actions against the Iranian state on behalf of the American government" and to use them "as leverage in the U.S.-Iranian nuclear negotiations" or to obtain the release of Iranians in prison in the United States. (Khalaji Rep. ¶ 34; *see also* Behnaz Hekmati Decl. ¶¶ 4-5 ("Iranian Government officials initially told our family that Amir would be released if we kept quiet. Judge Salavati, the judge presiding over Amir's case, later told us to do more to pressure the U.S. Government to cooperate with the Iranian Government's demands."); *see also* Mem. at 10-11 & nn. 5-6 (citing news articles reporting on Iran's interest in a possible prisoner swap).[5]

## II.  PROCEDURAL HISTORY

On May 9, 2016, Hekmati filed suit against Iran, claiming that its treatment of him constituted torture and hostage-taking in violation of the FSIA, 28 U.S.C. § 1605A. On May 24, 2016, plaintiff's counsel asked the Clerk of Court to effectuate service on Iran, pursuant to the provisions of 28 U.S.C. § 1608(a)(4), by mailing a copy of the summons, complaint, notice of suit, and offer to arbitrate, together with a translation of each into Farsi, the official language of Iran, to the United States Department of State, for it to effect service through diplomatic channels. (Aff. Requesting Foreign Mailing, May 24, 2016, ECF No. 5.) On November 29,

---

[5] *See, e.g.,* Thomas Erdbrink, *Amid Report of Jason Rezaian's Conviction, Iran Hints at Prisoner Exchange*, N.Y. Times (Oct. 12, 2015), *available at* http://www.nytimes.com/2015/10/13/world/middleeast/jason-rezaian-washington-post-conviction-iran.html; Steve Inskeep & Bill Chappell, *Speaker of Iran's Parliament Suggests Prisoner Swap for Rezaian, Other Americans*, NPR (Sept. 3, 2015), *available at* http://www.npr.org/sections/thetwo-way/2015/09/03/437322607/speaker-of-iran-s-parliament-suggests-prisoner-swap-for-rezaian-other-americans; Rick Gladstone, *Jason Rezaian Trial In Iran May Be More About Leverage Than Justice*, N.Y. Times (May 27, 2015), *available at* http://www.nytimes.com/2015/05/28/world/middleeast/jason-rezaian-trial-in-iran-may-be-more-about-leverage-than-justice.html; Indira Lakshmanan, *Fate of Jailed Americans Hangs Over Talks with Iran*, Bloomberg News (May 15, 2015), *available at* https://www.bloomberg.com/politics/articles/2015-05-15/fate-of-jailed-and-missing-americans-hangs-over-iran-talks.

2016, the Department of State confirmed that the documents were delivered to the Iranian Ministry of Foreign Affairs, via the Embassy of Switzerland, under cover of diplomatic note, on October 18, 2016, and that service was refused that same day (*see* Return of Service/Affidavit, Dec. 6, 2016, ECF No. 7). Iran's answer was due on December 17, 2016. (*Id.*) No answer or other response to the complaint was filed by that date; nor has any been filed to date. On December 20, 2016, plaintiff requested that the Clerk enter a default against Iran pursuant to Fed. R. Civ. P. 55(a) (Request for Entry of Default, Dec. 20, 2016, ECF No. 8), which the Clerk did on December 21, 2016 (Clerk's Entry of Default, Dec. 21, 2016, ECF No. 10). Pursuant to Federal Rule of Civil Procedure 55(b), plaintiff now moves for a default judgment.

## DISCUSSION

## I. LEGAL STANDARD FOR ENTRY OF A DEFAULT JUDGMENT AGAINST IRAN

Federal Rule of Civil Procedure 55(b)(2) gives a district court the discretion to enter a default judgment upon a party's motion, but the "entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). "[S]trong policies favor resolution of disputes on their merits," and therefore "[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir.1980) (internal quotations omitted)). In addition, "the procedural posture of a default does not relieve a federal court of its 'affirmative obligation'" to determine whether it has subject matter jurisdiction over the action," *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 79 (D.D.C. 2017) (quoting *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)), and "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6. The party seeking default judgment has the burden of establishing both subject

matter and personal jurisdiction. *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008). Finally, before a court can enter a default judgment under the FSIA, plaintiffs are required to establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Thus, the Court "may not unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), but "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016). In addition, "§ 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal quotations omitted); *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("when the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide"). Nor is an evidentiary hearing required; a "plaintiff may establish proof by affidavit." *Reed*, 845 F. Supp. 2d at 211; *see also, e.g.*, *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 336 n.2 (D.D.C. 2016).

As set forth below, plaintiff has demonstrated that he is entitled to a default judgment against Iran and an award of compensatory and punitive damages.

## II.     JURISDICTION

### A.     Subject Matter Jurisdiction

The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in a United States court. *See* 28 U.S.C. § 1604 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be

immune from the jurisdiction of the courts of the United States and of the States except as

provided in sections 1605 to 1607 of this chapter."); 28 U.S.C. § 1330(a)[6]; *Argentine Republic v.*

*Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Here, plaintiff asserts jurisdiction

under the "[t]errorism exception to the jurisdictional immunity of a foreign state." 28 U.S.C. §

1605A.[7] Section 1605A(a)(1), entitled "No immunity," provides that a foreign state

> *shall not be immune* from the jurisdiction of courts of the United States . . . *in any*
> *case* not otherwise covered by this chapter *in which money damages are sought*
> *against a foreign state for personal injury* or death that was *caused by an act of*
> *torture*, extrajudicial killing, aircraft sabotage, *hostage taking*, or the provision of
> material support or resources for such an act . . . .

*Id.* § 1605A(a)(1) (emphasis added). Section 1605A(a)(2), entitled "Claims heard," further

provides that a court "shall hear a claim under this section if–

> (i) . . . the foreign state was designated as a state sponsor of terrorism at the time
> the act described in paragraph (1) occurred . . . and . . . remains so designated
> when the claim is filed . . . .

> (ii) the claimant or the victim was, at the time the act described in paragraph (1)
> occurred – (I) a national of the United States; . . . and

> (iii) in a case in which the act occurred in the foreign state against which the claim
> has been brought, the claimant has afforded the foreign state a reasonable
> opportunity to arbitrate the claim in accordance with the accepted international
> rules of arbitration.

---

[6] Section 1330(a) provides that:

> The district courts shall have original jurisdiction without regard to amount in
> controversy of any nonjury civil action against a foreign state as defined in [the
> FSIA, 28 U.S.C. § 1603(a)] as to any claim for relief in personam with respect to
> which the foreign state is not entitled to immunity either under [28 U.S.C. §§
> 1605-1607] or under any applicable international agreement.

28 U.S.C. § 1330(a).

[7] Section 1605A was an amendment to the FSIA added by the National Defense Authorization
Act for Fiscal Year 2008, Pub.L. No. 110-181, § 1083 ("Defense Authorization Act"). It
replaced § 1605(a)(7), the former state-sponsored terrorism exception.

*Id.* § 1605A(a)(2)(A).

All of the conditions necessary to establish jurisdiction over plaintiff's claims under § 1605A have been satisfied. First, Iran has been continuously designated a state sponsor of terrorism since January 19, 1984. *See* U.S. Dept. of State, State Sponsors of Terrorism, available at http://www.state.gov/j/ct/list/c14151.htm (2017).[8] Thus, it was so-designated during the time Hekmati was detained and remained so at the time this case was filed. Second, Hekmati was a United States citizen at the time he was detained (Hekmati Decl. ¶ 3), and he is thus a United States national. *See* 28 U.S.C. § 1605A(h)(5).[9] Third, an offer of arbitration was included with the documents served on Iran (*see* Return of Service/Affidavit at 3, ECF No. 7), which is sufficient to satisfy the FSIA's requirement. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003) ("*Simpson I*") ("a reasonable opportunity to arbitrate" need not precede the filing of the complaint). Fourth, plaintiff is seeking money damages for personal injuries caused by defendant's actions. Finally, as explained below, Iran's actions constituted both torture and hostage taking.

### 1. Torture

Under § 1605A, the term "torture" is defined to "have the meaning given [it] in section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. 1350 note)." *Id.* § 1605A(h). As

---

[8] The term "state sponsor of terrorism" means a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371), section 40 of the Arms Export Control Act (22 U.S.C. 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism. 28 U.S.C.A. § 1605A(h)(6).

[9] The term "national of the United States" has the meaning given that term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)), 28 U.S.C. § 1605A(h)(5), which defines a "national of the United States" to mean "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States. 8 U.S.C. § 1101(a)(22).

defined therein:

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), *codified at* 28 U.S.C. § 1350 (note).

In *Price v. Socialist People's Libyan Arab Jamahiriya*, the D.C. Circuit gave extensive consideration to what conduct should be deemed to constitute torture under the FSIA. 294 F.3d 82, 92-93 (D.C. Cir. 2002) ("*Price I*"). It concluded that there were "two ambiguities lurking in the [TVPA's] definition" of torture: "The first concerns the meaning of 'severe': how much actual pain or suffering must defendants inflict before their conduct rises to the level of torture? The second involves the 'for such purposes' language: what must plaintiffs prove about the motivation for the alleged torture if they hope to deprive foreign states of their immunity?" *Id*. at

92.  As to the severity requirement, the Court observed that it "is crucial to ensuring that the conduct proscribed by the Convention [Against Torture] and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes."  *Id*.  Thus, it concluded that:

> [t]he critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture. . . .  This understanding thus makes clear that torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault. Not *all* police brutality, not *every* instance of excessive force used against prisoners, is torture under the FSIA.

*Id*. at 93.  Rather, the Court in *Price I* agreed with the Senate that "torture is a label that is 'usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.'"  *Id*. at 92-93.  As for the purposes requirement, the Court held that "it is clear from the text of the TVPA that the list of purposes provided was not meant to be exhaustive."  *Id*. at 93.  Rather, "this list was included in order to reinforce that torture requires acts both intentional and malicious, and to illustrate the common motivations that cause individuals to engage in torture."  *Id*.  Thus, the Court concluded that "whatever its specific goal, torture can occur under the FSIA only when the production of pain is purposive, and not merely haphazard."  *Id*.; *see Han Kim*, 774 F.3d at 1050 ("[S]uffering alone is insufficient to establish a claim under the FSIA's terrorism exception.  To qualify as torture, the mistreatment must be purposeful—that is, the defendant must have targeted the victim . . . .")

Applying this interpretation of torture  the Court of Appeals in *Price I* held that the allegations in the complaint were insufficient to allege torture because they "offer[ed] no useful details about the nature of the kicking, clubbing, and beatings that plaintiffs allegedly suffered,"

and, thus, there was "no way to determine . . . the severity of plaintiffs' alleged beatings – including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out – in order to ensure that they satisfy the TVPA's rigorous definition of torture." *Price I*, 294 F. 3d at 94 ("In short, there is no way to discern whether plaintiffs' complaint merely alleges police brutality that falls short of torture."); *see also Simpson*, 326 F.3d at 234 (holding that allegations that plaintiff was "interrogated and then held incommunicado," "threatened with death ... if [she] moved from the quarters [where she was] held," and "forcibly separated from her husband ... [and unable] to learn of his welfare or his whereabouts" "reflected a bent toward cruelty on the part of their perpetrators," but were "not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture within the meaning of the Act").)

District courts in this jurisdiction applying the principles set forth in *Price* and *Simpson* have consistently concluded that victims treated similarly to Hekmati were victims of torture. For example, in *Moradi*, this Court held that a detainee in Iranian prison experienced torture when his interrogators subjected him to "severe physical and mental pain, including threatening him with death and dismemberment, physically beating him, sexually assaulting him, and keeping him in excruciatingly painful positions for hours at a time during the interrogations." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 68-69 (D.D.C. 2015) Similarly, in *Price* itself, after the case was remanded and the complaint amended, the district court held that the amended complaint stated a claim for "mental torture" by alleging that the victims were "forced to watch on three separate occasions as fellow prisoners were beaten, one of whom was beaten to death," were "informed on each occasion that they would suffer the same fate if they refused to confess that they were guilty of espionage," and were "informed, during an interrogation at

which cabinet-level Libyan officials were present, that they were being afforded one last chance to confess, or they would be beaten as they had seen their fellow prisoners be beaten." *Price v. Socialist People's Libyan Arab Jamahiriya,* 274 F. Supp. 2d 20, 25 (D.D.C. 2003) (*Price II*), *aff'd*, 389 F.3d 192, 195-99 (D.C. Cir. 2004); *see also Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 425 (D.D.C. 2007) ("striking [the plaintiff] repeatedly on the soles of his feet with an electrical cable, hanging [him] upside down from the ceiling during an interrogation session, and assaulting [him] with a coke bottle" were "acts of torture"); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 152 (D.D.C. 2010) (hostage taken by an Iranian-supported terrorist group experienced torture in the form of "beatings, unsanitary conditions, inadequate food and medical care, and mock executions"); *Massie v. Government of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 66, 74 (D.D.C. 2008) (former members of a crew of a United States Naval vessel captured by the Government of the Democratic People's Republic of Korea (North Korea) in 1968 were victims of torture where they were "provided inadequate rations of food and forced to live in unsanitary conditions" and subjected to "individual threats of death, threats to kill others, [and] severe beatings" in order to coerce them into signing confessions); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 91, 97 (D.D.C. 2003) (victim was "tortured'" when his captors regularly beat him, threatened him with death, and confined him in "deplorable and inhumane conditions"); *Daliberti v. Republic of Iraq,* 146 F. Supp. 2d 19, 25 (D.D.C. 2001) (victim who was held at gunpoint, threatened with physical injury if he did not confess to espionage, and incarcerated "in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities" experienced torture as defined by the FSIA); *Sutherland v. Islamic Republic of Iran,* 151 F. Supp. 2d 27, 45 (D.D.C. 2001) ("the deprivation of adequate food, light, toilet facilities, and medical care for over six years amounts

to torture").

Applying the statute and the relevant caselaw to the facts of this case, this court has no difficulty in concluding that the physical and mental injuries inflicted upon Hekmati by his interrogators in conjunction with the other conditions of his detention constituted torture within the meaning of the FSIA.[10]  His mistreatment clearly goes beyond a mere "instance of excessive force" against a prisoner; rather the infliction of pain was deliberate and malicious and for the purpose of eliciting a false confession.  Accordingly, the Court concludes that Hekmati was the victim of torture.

### 2.    Hostage Taking

Under § 1605A, "the term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages."  28 U.S.C. § 1605A(h)(2).  As defined therein, hostage taking means:

> Any person who *seizes or detains and threatens to kill, to injure or to continue to detain another person* (hereinafter referred to as the "hostage") *in order to compel a third party*, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, *to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage* . . . .

*See* 28 U.S.C. § 1605A(h)(2).  "The essential element of [a] hostage-taking claim is that the intended purpose of the detention be to accomplish the sort of third-party compulsion described in the [C]onvention."  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359 (D.C. Cir. 2006) ("*Simpson II*") (quoting *Simpson I*, 326 F.3d at 234–35); *see also Price I*, 294 F.3d at 94. That is, the defendants must seek "some '*quid pro quo*' arrangement whereby the hostage would be released 'upon performance or non-performance of any action by that third

---

[10] As was the case in *Moradi*, plaintiff suggests that the Court could find that Hekmati was tortured simply by virtue of his extended period of solitary confinement, but the Court need not reach that novel issue given its conclusion that the totality of Hekmati's treatment constituted torture.  *See Moradi*, 77 F. Supp. 3d at 68 n.9.

party.'" *Simpson II*, 470 F.3d at 359 (quoting *Price I*, 294 F.3d at 94).

As set forth above, Iran detained Hekmati on false espionage charges and, for four- and-a-half years, continuously threatened to kill, injure, and detain him, in an effort to compel the United States to release Iranians imprisoned in the United States or make other political or financial concessions to Iran. Indeed, Iran ultimately released Hekmati as part of a prisoner exchange when the United States released several Iranian prisoners from U.S. prison. These facts establish that Iran's conduct constituted hostage taking under the FSIA.

As all of the conditions for subject matter jurisdiction under § 1605A are met, the Court concludes that it has jurisdiction over plaintiff's stated against Iran.

### B. Personal Jurisdiction

Personal jurisdiction over a foreign state exists if there is subject matter jurisdiction under § 1330(a) and service is made pursuant to 28 U.S.C. § 1608. 28 U.S.C.A. § 1330(b). Service may be effectuated under 28 U.S.C. § 1608 in one of four ways: (1) by "special arrangement for service between the plaintiff and the foreign state," (2) "in accordance with an applicable international convention on service of judicial documents," and if the first two options were not applicable, the service may be completed (3) by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," or (4) by requesting the clerk of the court to send the aforementioned package to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." 28 U.S.C. § 1608(a). As set forth above, plaintiff

properly effectuated service on defendant via the fourth method. Accordingly, the Court finds

that it has personal jurisdiction over defendant.

## III.    LIABILITY

Section 1605A(c) created a federal "private right of action" for acts of terrorism by

foreign states. 28 U.S.C. § 1605A(c). Drawing on the jurisdictional requirements set forth in §

1605A(a), it provides that:

> A foreign state that is or was a state sponsor of terrorism as described in
> subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state
> while acting within the scope of his or her office, employment, or agency shall be
> liable to—
>
> > (1) a national of the United States, . . .
>
> for personal injury or death caused by acts described in subsection (a) (1) of that
> foreign state, or of an official, employee, or agent of that foreign state, for which
> the courts of the United States may maintain jurisdiction under this section for
> money damages. In any such action, damages may include economic damages,
> solatium, pain and suffering, and punitive damages. In any such action, a foreign
> state shall be vicariously liable for the acts of its officials, employees, or agents.

*Id*. A claim brought under § 1605A(c) must be filed within ten years from the date the action

accrued to initiate an action. *See* 28 U.S.C. § 1605A(b).

In concluding that there is jurisdiction over Hekmati's claims under 1605A(a), the Court

has already determined all of the essential elements for imposing liability under 1605A(c) have

been established because section § 1605A(c) expressly incorporates the elements required to

waive the foreign state's immunity and vest the court with subject matter jurisdiction as the basis

for liability. Essentially, liability under § 1605A(c) will exist whenever the jurisdictional

requirements of §1605A(a)(1) are met. *See Kilburn*, 699 F. Supp. 2d at 155 ("Although an

analysis of a foreign sovereign's potential immunity and liability should be conducted separately,

the elements of immunity and liability under § 1605A(c) are essentially the same in that §

1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action."); *see also*

*Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53, 64–69 (D.D.C. 2008); *Murphy v. Islamic Republic of Iran,* 740 F. Supp. 2d 51, 72 (D.D.C. 2010).  In addition, as Hekmati was released from confinement in January 2016, this action was filed within the ten-year statute of limitations.  Accordingly, Iran is liable under § 1605A(c) for money damages for the personal injuries it caused Hekmati through its acts of torture and hostage-taking.  The only remaining question is the amount of damages to be awarded.

## IV.    DAMAGES

Plaintiffs are seeking two types of compensatory damages – damages for pain and suffering and economic damages – as well as punitive damages.

### 1.    Compensatory Damages

To obtain compensatory damages in a FSIA case, a plaintiff "must prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate."  *Reed*, 845 F. Supp. 2d at 213 (citing *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003)).

### a.    Pain and Suffering Damages

Hekmati seeks damages for pre- and post-release pain and suffering, which are described in great detail in Background Sections I.B & I.C, *supra*.  He asks for an award of $16,020,000 for his pre-release pain and suffering and $64,080,000 for his post-release and future pain and suffering.

Pain and suffering, past and future, are obviously a reasonably certain consequence of torture.  (*See* Discussion, Section II.A.1, *supra*)); *see Moradi*, 77 F. Supp. 3d at 69-70 (awarding damages for pain and suffering resulting from torture); *see also Stansell*, 217 F. Supp. 3d at 346 (same); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134-36 (D.D.C. 2005) ("*Price III*") (same); *Massie*, 592 F. Supp. 2d at 77 (same).  The challenge arises

in assigning a dollar value to such pain and suffering. *See, e.g.*, *Stansell*, 217 F. Supp. 3d at 345 ("quantifying these types of harms is inherently difficult"); *Moradi*, 77 F. Supp. 3d at 70 (same); *Price III*, 384 F. Supp. 2d at 134 (same). The primary consideration in these cases is to ensure that "individuals with similar injuries receive similar awards." *See Moradi*, 77 F. Supp. 2d at 70 (internal quotations omitted); *see also*, *e.g.*, *Stansell*, 217 F. Supp. 3d at 345 (same)

For his pain and suffering while imprisoned, Hekmati suggests $16.02 million because he was detained for 1602 days and "[c]ourts in this district, including this Court, typically set damages for prolonged and abusive captivity at $10,000 per day for the pain and suffering that victims experienced while imprisoned." (Mem. at 27); *see, e.g.*, *Moradi*, 77 F. Supp. 3d at 70 ($1.68 million for 168 days of imprisonment); *Stansell*, 217 F. Supp. 3d at 346 ($19.67 million for 1967 days held hostage); *Kilburn*, 699 F. Supp. 2d at 157 ($5.03 million for 503 days as hostage); *Massie*, 592 F. Supp. 2d at 77 ($3.35 million for 335 days of imprisonment); *Price III*, 384 F. Supp. 2d at 135 ($1.05 million for 105 days of captivity); *Sutherland,* 151 F. Supp. 2d at 51 ($23.54 million for 2,354 days of captivity); *Anderson v. Islamic Republic of Iran,* 90 F. Supp. 2d 107, 113 (D.D.C. 2000) ($24.54 million for 2,454 days of captivity). The Court sees no reason to deviate from this approach and therefore will award $16.02 million in pain and suffering damages for Hekmati's 1602 days (four and one-half years) of imprisonment.

For his pain and suffering post-imprisonment, Hekmati suggests $64.08 million because that is 4x the pre-release award amount, which was apparently the formula used by the district court in *Massie*. The problem with this approach is that it ignores two factors that are directly relevant to determining the magnitude of a victim's likely post-release pain and suffering: the victim's age at the time of release (the length of time he will be experiencing pain and suffering)

and the extent of the victim's long-term injuries (the level of pain and suffering).[11]  At the time

Hekmati was released he was 32 years old, and his life expectancy at that point was over 45

years.  *See, e.g.*, National Vital Statistics Reports, Vol. 64, No. 11 (Sept. 22, 2015).  In addition,

his injuries are severe and likely to persist.  Keeping those considerations in mind, and looking at

the awards in other detention cases, including *Moradi*, *Stansell*, *Price*, *Acree* , *Wyatt*, and

*Massie*, the Court will award Hekmati $10 million for his post-release pain and suffering.

In total, the Court awards Hekmati $26.02 million for his past and future pain and

suffering.

### b.  Economic Damages

Hekmati seeks economic damages in the amount of $5,728,179 million to compensate for

his lost earnings during his detention, since his release, and in the future.  (*See* Mem. at 31.)

"As a general rule, lost earnings – past and future – are compensable economic

damages."  *See Moradi*, 77 F. Supp. 3d at 71 (citing Restatement (Second) of Torts § 906).   In a

FSIA case, "[t]he report of a forensic economist may provide a reasonable basis for determining

the amount of economic damages."  *Reed*, 845 F. Supp. 2d at 214 (awarding economic damages

for lost earnings based on report of forensic economist); *see also Thuneibat*, 167 F. Supp. 3d at

48-50 (same); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (same);

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (same).  "In considering

---

[11] As an alternative, plaintiff suggests a lump sum award of $25 million because that is the
amount recently awarded by the court in *Stansell*.  217 F. Supp. 3d at 346.  In *Stansell*, though, it
appears that the $25 million was intended to compensate for both post-release pain and suffering
and the fact that, in the court's estimation, $10,000 per day did not adequately compensate the
plaintiffs for their pre-release pain and suffering.  *See id.* (additional lump sum added to per diem
"accounts for the length of time [the plaintiffs] were held hostage—which far exceeds the
periods of captivity of plaintiffs in other FSIA cases decided in this District—the violent
shooting down of their aircraft, the extremity of their treatment in the jungle, and the ongoing
physical, psychological, and emotional effects of their experience").

an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402.

To support his claim for economic damages, plaintiff has submitted an earning capacity evaluation from Robert Taylor, the Director of Vocational Diagnostics, Inc. and an expert report from Frank Slesnik, Ph.D., a forensic economic consultant. (*See* Mem. Ex. E (Earning Capacity Evaluation of Robert Taylor ("Taylor Eval.")); *id*. Ex. G (Expert Report of Frank Slesnik, Ph.D ("Slesnik Report")).) Based on these reports, the Court will award the economic damages sought by Hekmati.

Taylor "evaluate[d] [plaintiff's] ability to work and earn wages but for and considering the injuries he sustained as a result of the subject incident."[12] (Taylor Eval. at 1.) Taylor first analyzed plaintiff's "earning capacity had the subject incident not occurred." (*Id*. at 10.)[13] He concludes that Hekmati would likely have worked full time in the competitive labor market after obtaining his Master's degree in December 2012 and that "[h]e then could have chosen to pursue a doctoral degree in economics, which would have expanded the vocational opportunities available to him as well as his probable earnings." (*Id*. at 19.) He calculates that Hekmati's worklife expectancy after earning a Master's degree would have been another 35.03 years and that if he had continued his education and completed a Ph.D. in 2020, his worklife expectancy at

---

[12] Taylor's evaluation is based upon his review of all of the documents filed in the above-captioned case along with documentation of plaintiff's earnings from 2005 through 2015. (Taylor Eval. at 1-9.)

[13] Taylor's report explains that he uses "the RAPEL methodology," which "considers labor market access, placeability, earnings, labor force participation and worklife expectancy both before and after the subject incident. Post-subject incident, rehabilitation strategies are considered that may enhance one's labor market access, placeability, earnings, labor force participation and worklife expectancy." (Taylor Eval. at 10.) He describes this methodology as "widely published in the rehabilitation counseling literature and the most widely-used methodology for evaluation of earning capacity by rehabilitation counselors." (*Id*.)

that time would have been another 30.47 years. (*Id.*) As for Hekmati's earning capacity in light of the subject incident, Taylor concludes that he ████████████████████████████████

████████████████████████████████████████████████████████████████████

(Taylor Eval. at 21.) ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ (*Id.*)

Slesnik "calculate[d] [plaintiff's] lost earning due to his incarceration in Iran from August 2011 through January 2016." (Slesnick Report at 2.) In making his calculations, Slesnick also assumed that plaintiff would have completed his Master's program and started work in January 2013. (*Id.* at 5.) To calculate what plaintiff would have earned under those circumstances, Slesnick considered two possible scenarios: (1) he "would have earn[ed] the equivalent of an individual with a [Master's] degree," or (2) "he would have earned the equivalent of an economist." (*Id.* at 4.) Slesnick then looked at the earnings data for each scenario at the 50th and 75th percentile, concluding that "[g]iven [plaintiff's] background, it is reasonable to assume that he might obtain a higher than average income for a particular class of individuals." He then calculated the present value of plaintiff's lost earnings for each set of assumptions, as shown below:

|                  | 50th percentile | 75th percentile |
|------------------|-----------------|-----------------|
| Economist        | $4,631,638      | $6,173,317      |
| Masters' Degree  | $3,404,888      | $4,746,145      |

(*Id.* at 4, 8 & Tables 1-4.) Slesnick next calculated plaintiff's likely post-injury compensation under a couple of scenarios: ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Finally, Slesnick calculated Hekmati's

net economic loss (the difference between what he would have earned had he not been detained

and what he is likely to actually earn) for each scenario, coming up with a range of ████████

████████. However, in his opinion the best estimate, given plaintiff's "past earnings and his

strong personal recommendations from his superiors," would be to assume that Hekmati would

have had a job as an economist earning in the 75th percentile had he not been detained. Under

that scenario, the present value of his lost earnings is $6,173,317, and the net economic loss

would be between ████████████████. (*Id*. at 9-10.) Within this range, Slesnick selects

████████████████████ $5,728,179 as his best estimate of economic loss as it is a

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ (*Id*. at 9-10.)

The Court has closely reviewed the reports submitted by Taylor and Slesnick. Both are

highly qualified, and their analyses and calculations are thoroughly explained and based on

reasonable assumptions well-grounded in the facts. Accordingly, their reports provide a

reasonable basis for awarding $5,728,179 in economic damages.

### 2. Punitive Damages

Punitive damages are appropriate in cases involving "outrageous conduct." Restatement

(Second) of Torts § 908(1). Their purpose is "to punish and deter the actions for which they are

awarded.'" *Moradi*, 77 F. Supp. 3d at 73 (quoting *Oveissi v. Islamic Republic of Iran*, 879 F.

Supp. 2d 44, 55-56 (D.D.C. 2012)). According to plaintiff, punitive damages are warranted

because he was "held in extreme solitary confinement, beaten, threatened, deprived of adequate

food and sanitary conditions, and psychologically battered by his captors for nearly five years"

(Mem. at 31), and "Iran's conduct is consistent with a pattern and practice of imprisoning U.S.–

Iranian citizens under false pretenses and subjecting them to extreme physical and psychological abuse during their detention." (*Id.* (citing Khalaji Rep. ¶¶ 18-34).) The evidence supports plaintiff's contention, and the Court has no trouble concluding that Iran's conduct was sufficiently outrageous to warrant the imposition of punitive damages.

As for the amount, courts generally calculate the proper amount of punitive damages by considering "four factors: (1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Moradi*, 77 F. Supp. 3d at 73 (quoting *Oveissi*, 879 F. Supp. 2d at 56). All of these factors suggest that a substantial award of punitive damages is justified in this case. Defendant's conduct was truly horrific and it caused substantial and permanent harm. In addition, defendant's conduct is part of a longstanding pattern and policy, making the need for deterrence clear.[14] Finally, "Iran is a sovereign and has substantial wealth." *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016).

The more difficult question here is what the actual amount of punitive damages should be. *See Anderson*, 90 F. Supp. 2d at 114 ("It is never a simple task to calibrate an award of punitive damages to the gravity of the offense.").

Plaintiff first suggests that $300 million as the appropriate award of punitive damages because "a number of courts have awarded $300 million in punitive damages in cases where plaintiffs suffered harm at the hands of MOIS on the basis that such an award is equal to three times the amount of annual funding provided by Iran to MOIS." (Mem. at 32 (citing *Anderson*,

---

[14] At this time at least four other American citizens are imprisoned in Iran. *See* Carol Morello, *U.S. prisoner in Iran receives pacemaker as Trump calls for Tehran to free him*, Washington Post, Sept. 21, 2017 available at https://www.washingtonpost.com/world/national-security/us-prisoner-in-iran-has-pacemaker-put-in-as-trump-calls-for-tehran-to-free-him/2017/09/19/e295bba3-ae29-44f0-af81-3fe097771485_story.html?utm_term=.08eb5b51e2a9.

90 F. Supp. 2d at 114).)  The Court sees several problems with this approach.  First, although the evidence supports plaintiff's contention that MOIS had some involvement in Hekmati's detention and torture, in particular while he was in Ward 209, and in the similar treatment of other United States citizens, there are substantial and material differences between what happened to Hekmati and what happened to Anderson and Sutherland, who were kidnapped by terrorist groups and held for over six years in "dungeons" in various parts of Lebanon. *Anderson*, 90 F. Supp. 2d at 108; *Sutherland*, 151 F. Supp. 2d at 31.  In addition, the $300 million figure was based on expert testimony in those cases, *see Anderson*, 90 F. Supp. 2d at 114; *see also Sutherland*, 151 F. Supp. 2d at 52-53, but they were decided over 15 years ago and the record in this case contains no such evidence.  *Cf. Roth*, 78 F. Supp. 3d at 406 (awarding punitive damages in the amount of $112.5 million, three times the amount that Iran was providing Hamas annually during the relevant time, as established by evidence in the record before the court).  Given the staleness of the evidence and the differences in plaintiffs' experience, the Court cannot simply adopt the punitive damages amount awarded in *Anderson*.

In the alternative, plaintiff asks that the Court award "punitive damages in an amount equal to a plaintiff's total compensatory damages." (Mem. at 33 (citing cases).)  Other courts have used this approach when the expenditure times multiplier doesn't work.  *See, e.g.*, *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 80–82 (D.D.C. 2014).  Indeed, this Court used this approach in *Moradi*, which involved a very similar set of facts, *see Moradi*, 77 F. Supp. 3d at 73, and sees no reason not to follow it here.  As set forth above, plaintiff's total compensatory damages award in this case is $31,748,179.00 ($26,020,000 for pain and suffering plus $5,728,179 in economic damages).  Accordingly, the Court will award punitive damages in the amount of $31,748,179.00.

**CONCLUSION**

For the reasons stated above, the Court grants plaintiffs' motion for default judgment and enters judgment for plaintiffs in the amounts specified above. A separate Default Judgment accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   September 29, 2017